In re COUNTY GREEN LIMITED PARTNERSHIP, Debtor
(four cases).

CONCRETE READY–MIX OF LYNCH-BURG, INC., Warner Supply Corporation, Custom Wood Products, Inc., H. L. Hales Insulation, Inc., Pool Equipment Corporation, May Bros., Inc., Falwell Excavating Co., Inc., H & W Floor Tile & Wall Co., Inc., Woods Plumbing & Heating Company, Goldberg Co., Inc., Virginia Plumbing Suppliers, Inc., Powers Fence Company of Lynchburg, Inc., C. B. Shaver Sheet Metal and Heating Company, John G. Rhodes, t/a Rhodes Drywall Co., Gypsum Distributors of Roanoke, Inc., Automatic Equipment Sales of Roanoke, Inc., Salem Truck and Equipment, Inc., O. R. Chisom Electrical Contractor, Inc., Warren D. Lynch, Charles R. Beck and Charles R. Beck, t/a Apartment Maintenance Company, Appellees,

v.

LAWYERS TITLE INSURANCE CORPORATION, Appellant.

CONCRETE READY–MIX OF LYNCH-BURG, INC., Warner Supply Corporation, Custom Wood Products, Inc., H. L. Hales Insulation, Inc., Pool Equipment Corporation, May Bros., Inc., Falwell Excavating Co., Inc., H & W Floor Tile & Wall Co., Inc., Woods Plumbing & Heating Company, Goldberg Co., Inc., Virginia Plumbing Suppliers, Inc., Powers Fence Company of Lynchburg, Inc., C. B. Shaver Sheet Metal and Heating Company, John G. Rhodes, t/a Rhodes Drywall Co., Gypsum Distributors of Roanoke, Inc., Automatic Equipment Sales of Roanoke, Inc., Salem Truck and Equipment, Inc., O. R. Chisom Electrical Contractor, Inc., Warren D. Lynch,

**290**

Charles R. Beck and Charles R. Beck, t/a Apartment Maintenance Company, Appellees,

v.

FIRST & MERCHANTS NATIONAL BANK, Appellant.

CONCRETE READY–MIX OF LYNCHBURG, INC., Warner Supply Corporation, Custom Wood Products, Inc., H. L. Hales Insulation, Inc., Pool Equipment Corporation, May Bros., Inc., Falwell Excavating Co., Inc., H & W Floor Tile & Wall Co., Inc., Woods Plumbing & Heating Company, Goldberg Co., Inc., Virginia Plumbing Suppliers, Inc., Powers Fence Company of Lynchburg, Inc., C. B. Shaver Sheet Metal and Heating Company, John G. Rhodes t/a Rhodes Drywall Co., Gypsum Distributors of Roanoke, Inc., Automatic Equipment Sales of Roanoke, Inc., Salem Truck and Equipment, Inc., O. R. Chisom Electrical Contractor, Inc., Warren D. Lynch, Charles R. Beck and Charles R. Beck, t/a Apartment Maintenance Company, Appellees,

v.

Samuel L. MESSINA and Tech-Mod Corporation, Appellant.

CONCRETE READY–MIX OF LYNCHBURG, INC., Warner Supply Corporation, Custom Wood Products, Inc., H. L. Hales Insulation, Inc., Pool Equipment Corporation, May Bros., Inc., Falwell Excavating Co., Inc., H & W Floor Tile & Wall Co., Inc., Woods Plumbing & Heating Company, Goldberg Co., Inc., Virginia Plumbing Suppliers, Inc., Powers Fence Company of Lynchburg, Inc., C. B. Shaver Sheet Metal and Heating Company, John G. Rhodes, t/a Rhodes Drywall Co., Gypsum Distributors of Roanoke, Inc., Automatic Equipment Sales of Roanoke, Inc., Salem Truck and Equipment, Inc., O. R. Chisom Electrical Contractor, Inc., Warren D. Lynch,

Charles R. Beck and Charles R. Beck, t/a Apartment Maintenance Company, Appellees,

v.

COUNTY GREEN LIMITED PARTNERSHIP, Appellant.

Nos. 77–2626 to 77–2629.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1978.

Decided July 31, 1979.

John E. McDonald, Jr., Richmond, Va. (Beverley L. Crump, Robert S. Bozarth, Addison Baker Thompson, McDonald & Crump, Richmond, Va., on brief), for appellants in Nos. 77–2626 and 77–2627.

William J. Strickland, McGuire, Woods & Battle, Charlottesville, Va., on brief, for appellants in No. 77–2627.

Robert M. Musselman, Douglas E. Little, Charlottesville, Va., on brief, for appellants in Nos. 77–2628 and 77–2629.

Charles F. Barnett, Jr., Roanoke, Va. (Jack V. Place, Place, Thomas & Prillaman, Roanoke, Va., on brief), for appellees.

Before WINTER, RUSSELL and WIDENER, Circuit Judges.

PER CURIAM:

On April 23, 1973, Tech-Mod Corporation, a general partner in County Green Limited Partnership (the Partnership or the Limited Partnership), engaged Lancingwood Arms, Ltd. (Lancingwood) to build an apartment complex for a price of $2,141,700. There is no question but that this contract was an arms length agreement and bona fide. Tech-Mod subsequently assigned the contract to County Green Limited Partnership which owned the real estate. First and Merchants National Bank financed the project with a $2,250,000 construction loan to the Partnership. The loan was secured by a deed of trust on the real estate where the apartments were to be built. When Lancingwood defaulted on the contract, County Green Development Corporation (Development or Development Corporation) was organized by some of the owners of the real estate and took over as the new general contractor and agreed to complete the work for $2,051,725.13. Two days later, on August 3, 1974, this sum was reduced to $1,808,257.13 to reflect payments previously made to Lancingwood. It was a way to credit the work in place. Charles Beck, formerly job superintendent for Lancingwood, was hired as manager of the project for Development Corporation. The lien claimants, with an exception or two, made agreements with Development Corporation, and did not carry over their agreements with Lancingwood. With whom the agreements were made is not material to the appeal.

Work continued under the new contract until October 1975, and the project was well along toward completion at that time. However, due to inflation, cost overruns, specification adjustments, and other problems, the original funding for the project proved to be inadequate. F & M refused to disburse any more funds and work stopped. Several mechanics liens had already been filed pursuant to Virginia Code § 43–7, and shortly after the work had stopped, County Green Limited Partnership, the owner, filed a voluntary petition for an arrangement under Chapter XII of the Bankruptcy Act. Subsequently, the mechanics lienors sought to enforce their liens in the bankruptcy court.

The bankruptcy court held against the lienors because it found that at the time the liens were filed the owner (Limited Partnership) was not indebted to the general contractor (Development Corporation) as required by Virginia Code § 43–7.[1] The district court reversed the bankruptcy court's decision and held that there was no general contractor in this case because Development Corporation was the mere alter ego of the Limited Partnership. *Concrete Ready-Mix of Lynchburg, Inc., et al. v. County Green Limited Partnership, et al.,* 438 F.Supp. 701 (W.D.Va.1977). The district court therefore reasoned that plaintiffs were entitled to have their liens treated under § 43–4 (liens of general contractors) and thus not limited by the amount paid to Development Corporation by the Limited Partnership since in essence "the mechanic's lienor who dealt with the Corporation dealt with the owner . . . ." 438 F.Supp. at 707.

We have reviewed the record and hold that the decision of the bankruptcy court was not clearly erroneous. We therefore reverse the district court and reinstate the order of the bankruptcy court.

We first note the general rule that the decision to pierce a corporate veil and expose those behind the corporation to liability is one that is to be taken reluctantly and cautiously. *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 685 (4th Cir. 1976). However, equity will not hesitate to disregard the corporate fiction when justice requires such a result. The general rules rarely are helpful in cases of this type, but the courts have developed a long list of relevant factors to aid decision making in this area. See *DeWitt,* 540 F.2d at 686. We also note that a single factor will rarely, if ever, be sufficient to justify the drastic remedy of piercing the corporate veil. The trier of fact should look at all the circumstances in each case rather than relying on any single factor. *DeWitt,* 540 F.2d at 687. The decision to pierce the corporate veil depends largely on the resolution of questions of fact. Therefore, the decision of the bankruptcy court should not have been reversed unless it was clearly erroneous, Bankruptcy Rule of Procedure 810.

At the outset, it will be helpful to spell out the relationships of the various parties. County Green Limited Partnership, the owner, consists of 25 limited partners and two general partners. The general partners are Dr. Samuel Messina and Tech-Mod Corporation. Dr. Messina is the president, a director, and sole shareholder of Tech-Mod. County Green Development Corporation was formed to finish the project after the default of Lancingwood. Messina is president and his brother is secretary. The stockholders are Messina, his brother, Tech-Mod, and Jack Weingarten, an unrelated party. As the description above indicates, the parties in this case are closely interrelated, but of course overlapping ownership is not a sufficient reason in and of itself to pierce a corporate veil. However, plaintiffs assert several other

---

1. § 43–7 states: Any subcontractor, in order to perfect the lien given him by § 43–3 shall comply with § 43–4, and in addition give notice in writing to the owner of the property or his agent of the amount and character of his claim. But amount for which a subcontractor may perfect a lien under this section shall not exceed the amount in which the owner is indebted to the general contractor at the time the notice is given, or shall thereafter become indebted to the general contractor upon his contract with the general contractor for such structure or building or railroad.

reasons which they feel justify the decision of the district court.

Plaintiffs first point to the undercapitalization of Development Corporation. The stated capital was $100 and at most the initial capital surplus was $400. Plaintiffs argue that $500 is grossly insufficient given the size of the project, but they do not mention the $2,250,000 loan from F & M Bank. This loan was plainly a substantial asset available for the payment of debts.

Second, plaintiffs argue and the district court found that Development Corporation failed to act in its own best interest and that this failure is evidence of its domination by the Limited Partnership and Messina. Specifically, plaintiffs say the contract price for the apartment complex was too low. The buildings did indeed cost more than the contract price, and the building permit application does show the estimated cost of construction to be $2,750,000. While this is some evidence of a proper price, it is not conclusive, and for the reasons which follow it is clear that the plaintiffs have not shown the bankruptcy judge's finding to be clearly erroneous.

First, the new contract price was comparable to the first contract price reached in an admittedly arms length transaction between the Limited Partnership and Lancingwood. If the original contract price of $2,141,700 were reduced by the $243,474 paid to Lancingwood,[2] the price on that basis would be $1,898,226, from which should be subtracted $50,000 included for timely completion, leaving $1,848,226, which would have been due to Lancingwood if its contract had been completed late, as the new contract was, for it was never completed. The admitted payments on the new contract were $1,854,899.13, some $6,673 more than that contract price.

■ The district court, considering no figures we have not mentioned, found the Development Corporation reduced the new contract price $243,474. It implicitly found such reduction was without cause, although

that amount, to the dollar, represents work in place, which we consider to be a justifiable reason for reducing the price. Although the new contract price was some $39,975 lower than the initial price, even discounting the $50,000 item for timely completion, that $39,975 sum is not enough to make the prices not comparable, and considering that more than the initial contract price was paid for the job, the $39,975 figure loses its relevance. The amendment of the contract to take into account work in place, we do not think a reason to set aside the corporate entity by inferring a basic injustice from an unconscionably low contract price.

Claimants also point to payments by Development Corporation to Tech-Mod ($680,-000) and Eagle ($50,000) which came from the funds loaned by F & M to construct the project. The argument is that this was an improper diversion of funds. It fails for several reasons. First, with respect to the $680,000, it is incorrect to say that this money was paid by Development to Tech-Mod; rather, it was paid directly from F & M to Tech-Mod. Second, and more importantly, the record shows that Tech-Mod paid $601,246.58 on the construction contract, thereby accounting for a large portion of the $680,000. An even more fundamental problem to claimants' position, however, is the bankruptcy judge's reliance on the independently prepared accounting report (Stosch report) which shows that the payments exceeded the contract price. Thus, even when the claimed payments from Development to Tech-Mod and the payment to Eagle Corporation are taken into account, the Limited Partnership had overpaid the contract by the time the liens were filed.

The bankruptcy court's reliance on the Stosch report was particularly justified since the parties stipulated "that the report of Walter Stosch is admissible as facts with such probative value as the court may attach to it and *the fact of the payments as reflected therein is admitted.*" (Emphasis added) Claimants attempt to avoid the

---

2. This represents work in place when the Development Corporation entered into its contract. The amount is not disputed. Appellees, erroneously, we think, dispute consideration of that sum in arriving at what the new contract price should have been.

second part of the stipulation by questioning not the fact of payment but rather "the propriety, characterization and legal ramifications of those payments. . . ." However, it is the fact of payment which is important here, and once it is determined that Development Corporation received payments on the contract substantially in excess of a contract price which was not excessively low, and indeed was very close to a price negotiated in an arms length transaction, the claimants' argument for piercing the corporate veil loses much of its force.

■ The district court relied on two additional factors in reaching its decision. First, it found that corporate formalities were not followed. Second, it found that the dominant shareholder (Dr. Messina) had breached his fiduciary duty to Development Corporation. With respect to corporate formalities, the district court did not recite the particulars of this finding, but we presume it was referring in part to the manner in which some of the payments were made to subcontractors and to Development. While some of the payments were not made from the owner to the contractor, rather by others on the owner's behalf, this is simply not enough to justify the drastic remedy of piercing the corporate veil. Furthermore, the record shows that Development's books were kept separately from those of the Limited Partnership. In fact, Development had a full time bookkeeper. Appellees argue that the necessity of having an independent accounting report prepared demonstrates the failure to observe corporate formalities. We disagree. Reports of this kind are frequently used by bankruptcy courts, and even to the extent that Development's records were confused, we do not feel that this problem justifies the remedy sought in this case. With respect to the duty of a controlling shareholder, we do not think the claimants can be heard to complain when payments in excess of a fair contract price were made to Development Corporation.

Finally, in reaching its result the district court placed great reliance on *DeWitt Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 (4th Cir. 1976) (South Carolina law). The holding of that case is not controlling for several reasons. First, and most importantly, the facts in *DeWitt* do not show anything resembling the payment of a fair contract price such as is present in the case at bar. Second, in *DeWitt* the controlling shareholder expressly promised the plaintiff that he would take care of the corporation's debt if it were to fail. No such promise was made in the case at bar. Finally, *DeWitt* held that the decision of the district court to pierce the corporate veil was not clearly erroneous. The district court was the trier of fact in *DeWitt,* unlike the case at bar. The complex maze of events before us admittedly can be characterized in different and sometimes conflicting fashions. However, the issue before the district court was not what decision it would reach in the first instance, but rather whether the bankruptcy court's refusal to pierce the corporate veil was clearly erroneous. As we said in *DeWitt :*

> "The circumstances which have been considered significant by the courts in actions to disregard the corporate fiction have been 'rarely articulated with any clarity.' . . . Perhaps this is true because the circumstances 'necessarily vary according to the circumstances of each case,' and every case where the issue is raised is to be regarded as *'sui generis* [to] * * * be decided in accordance with its own underlying facts.' Since the issue is thus one of fact, its resolution 'is particularly within the province of the trial court' and such resolution will be regarded as 'presumptively correct and [will] be left undisturbed on appeal unless it is clearly erroneous.' "

540 F.2d at 684.

■ The bankruptcy court's decision not to pierce the corporate veil was a reasonable one and is adequately supported by the record. In our opinion it was not clearly erroneous.

Claimants present several other arguments which they feel justify a decision in their favor even if the corporate fiction is

respected. We have reviewed these arguments and find them to be without merit.

The decision of the district court is reversed and the case is remanded with instructions to reinstate the order of the bankruptcy court.

REVERSED AND REMANDED WITH INSTRUCTIONS.