WALTER M. CHEATLE, ET AL.

V.

RUDD'S SWIMMING POOL SUPPLY CO., INC.

Record No. 840983

October 9, 1987

Present: All the Justices

*Benjamin C. Ackerly (Virginia W. Powell; Deborah L. Fletcher; Hunton & Williams*, on briefs), for appellant.

*James Ray Cottrell (Mark Lee Salomon; Gannon, Cottrell & Ward, P.C.*, on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

This is an appeal from a final decree in equity imposing judgment *in personam* for compensatory and punitive damages against officers, directors, and shareholders of a bankrupt corporation. The theories of recovery were: fraudulent conveyance, piercing the corporate veil, and fraud and deceit.

The essential facts are undisputed. Prior to 1978, Kenneth M. Rudd, the sole stockholder of appellee Rudd's Swimming Pool Supply Co., Inc. (Supply), had established a business in Northern Virginia which managed, supplied, and serviced swimming pools and related facilities. One of Rudd's employees was John C. DeMarr.

In 1978, DeMarr purchased the management portion of Rudd's business and the right to use the Rudd name. DeMarr incorporated the new business in October 1978 as Rudd's Swimming Pool Management & Service Company, Inc. (Management). DeMarr was the sole shareholder of the new corporation. Part of the consideration given to Supply was two promissory notes made by Management.

In 1979, appellant Walter M. Cheatle became a 50 percent shareholder and a director in Management with DeMarr. Subsequently, but prior to a reorganization of Management, Cheatle transferred his shares in the corporation to his wife, appellant Terry Webb Cheatle, in consideration for sums that she advanced him when he had been in financial difficulty. Following transfer to his wife, Cheatle had a proxy to vote her stock and "was handling the stock for her" because "she didn't know anything about the business."

In August of 1979, Supply filed for bankruptcy. The bankruptcy trustee abandoned the two promissory notes of Management held by Supply.

Following Supply's bankruptcy, Management's business deteriorated and, because of the Rudd name identification, Management's ability to operate was affected adversely. Management had difficulty, because of the stigma associated with Supply's bank-

ruptcy, in obtaining credit, having supplies delivered, and procuring contracts to manage swimming pools.

In early 1981, contemporaneous with a desire by DeMarr to move to Florida to organize another business there, John Cusack was persuaded by DeMarr to invest $125,000 in Management's business. As negotiations progressed, Cusack insisted on control of the business, a corporate name change, and assurance that none of his investment would be used to pay outstanding liabilities of Management. Cheatle and DeMarr consulted a tax attorney, Jonathan J. Broome, Jr., who devised a reorganization of Management.

In March 1981, Supply filed an action against Management to recover on the promissory notes. In May 1981, Supply brought another action against Management to recover an open account indebtedness. In the latter action as a defensive tactic, Management filed a counterclaim and a third-party claim against Rudd individually, asserting that Rudd conveyed the business to DeMarr at a time when Rudd knew the business did not have the value as claimed by Rudd. Attorney Raymond J. Diaz, Broome's law partner, represented Management in defense of those two actions. DeMarr moved his residence to Florida in August 1981 and Cusack assumed supervision over the employees of Management and over the conduct of the business.

In September 1981, pursuant to the plan of reorganization, Management transferred all assets and liabilities to a new corporation, Regency Pools of Virginia, Inc. (Regency), except for $10,000 cash to cover attorney's fees in connection with the reorganization and except for the notes payable to Supply. According to the testimony, the reorganization was pursuant to applicable provisions of the Internal Revenue Code which allowed transfer of corporate assets without requiring transfer of all liabilities and which permitted the carryover of net operating losses from Management to Regency. There was an exchange of stock between Management and Regency. At the time of reorganization, Cusack received a one-third interest in Regency in consideration for the $125,000 he had procured for the new company. DeMarr's wife received her husband's one-third interest and Cheatle's wife obtained a one-third interest in Regency in exchange for her interest in Management. Cusack, Walter Cheatle, and John DeMarr were initial directors of Regency.

The organizational meeting of Regency took place in Diaz's office in October 1981. Among those present were the Cheatles and Cusack. After activation of Regency in that meeting, the corporation began operating the same business as Management from the same location, with the same employees, and with primarily the same customers.

In March 1982, ten days before the trial of the litigation between Supply and Management, Diaz, who had been retained on an hourly basis, withdrew as counsel of record for Management due to nonpayment of his fees. On March 15, 1982, the court granted default judgments against Management. In the promissory-note action, judgment was entered for $65,000, plus interest and attorney's fees. In the open-account action, judgment was for $12,928.27, plus interest.

Because the judgments could not be collected by Supply, it filed the present chancery suit in November 1982 based on the default judgments against Management, Regency, the DeMarrs, the Cheatles, and Cusack. Management filed no pleadings and Supply abandoned its claim against Cusack and Regency because they had filed bankruptcy.

In pertinent part, the suit alleged that the creation of Regency and the subsequent transfer of Management's liabilities and assets to Regency, except for the liabilities to Supply, (1) constituted a fraudulent conveyance of assets under Code § 55-80; (2) constituted grounds for piercing the corporate veil of Regency and Management sufficient to hold the individual defendants liable; and (3) constituted fraud and deceit on the part of the individual defendants, who controlled both corporations. The plaintiff sought to declare the conveyance of assets from Management to Regency void and asked judgment against the individual defendants for compensatory and punitive damages.

Following a bench trial in April 1984, the trial court found that Supply had "made out the case that [it] set out to make" and entered judgment against the Cheatles and the DeMarrs for $87,678.27 in compensatory damages. The court also awarded punitive damages against Walter Cheatle and John DeMarr, each in the amount of $5,351.38. Only the Cheatles appeal from the judgment order entered in April 1984.

On appeal, we must speculate upon the precise basis for the trial court's decision. In announcing his ruling following the trial, the judge did not particularize the reasons for his findings, except

to state that he adopted "for the most part" the reasoning Supply's attorney advanced during trial argument.

■ The first issue deals with Supply's theory of fraudulent conveyance. As pertinent here, Code § 55-80 renders void every conveyance or transfer made "with intent to delay, hinder or defraud creditors . . . of or from what they are or may be lawfully entitled." In *Mills* v. *Miller Harness Co.*, 229 Va. 155, 326 S.E.2d 665 (1985), decided after the judgment below, we held that § 55-80 does not authorize an *in personam* judgment when a fraudulent conveyance is set aside. *Id.* at 158, 326 S.E.2d at 667. We will assume, without deciding, that Supply proved the transfer from Management to Regency was void as a fraudulent conveyance under the statute. In view of *Mills*, however, Supply agrees on appeal that the trial court erred if it fixed personal liability against the Cheatles based upon § 55-80. Accordingly, we need address that issue no further.

The second issue is whether the trial court erred in piercing the corporate veil, if indeed that was a basis for the holding below. While it is not clear from the record whether the court decided that the corporate structure of Management or Regency was to be disregarded, the parties assume that Regency's veil was pierced.

■ The proposition is elementary that a corporation is a legal entity entirely separate and distinct from the shareholders or members who compose it. This immunity of stockholders is a basic provision of statutory and common law and supports a vital economic policy underlying the whole corporate concept. *Beale* v. *Kappa Alpha Order*, 192 Va. 382, 397, 64 S.E.2d 789, 797 (1951). Therefore, a decision to refuse to recognize this immunity constitutes "an extraordinary exception" to be permitted only when it becomes necessary to promote justice. *Id.*, 64 S.E.2d at 797-98.

A decision whether to disregard the corporate fiction depends largely upon resolution of questions of fact with the burden of proof resting upon the party seeking to pierce the veil. Pertinent to this case, the plaintiff must show that the corporate entity was the *alter ego*, alias, stooge, or dummy of the individuals sought to be charged personally and that the corporation was a device or sham used to disguise wrongs, obscure fraud, or conceal crime. *Lewis Trucking Corp.* v. *Commonwealth*, 207 Va. 23, 31, 147 S.E.2d 747, 753 (1966). A trial court's ruling on such questions will be

regarded as presumptively correct and will not be overturned on appeal unless clearly erroneous.

■ In the present case, the presumptive correctness of the decision below loses force because we are not certain the trial court actually found, in assessing individual liability upon the Cheatles, that the corporate structure should be disregarded. Nonetheless, we conclude that the evidence was utterly insufficient to warrant casting aside the corporate entity.

■ The mere fact that the transfer from Management to Regency may have been with the intent to hinder, delay, or defraud Supply, insofar as Management's obligation under the promissory notes was concerned, does not, without more, warrant the extraordinary action of imposing individual liability for that corporate debt upon the Cheatles. The Cheatles were not personally liable to Supply, having neither endorsed the promissory notes nor guaranteed the open account indebtedness. Thus, no contention can successfully be made that the corporate reorganization was a sham by the Cheatles to avoid personal liability. Moreover, there was no showing that the Cheatles commingled corporate and personal assets or that they siphoned corporate assets into their own pockets. Corporate formalities were followed in the establishment of Regency and there was a valid corporate purpose for the reorganization of Management. Cusack, who was providing an infusion of capital, demanded a new image for the declining business and competent counsel recommended a reorganization structured to obtain tax advantages. In sum, the record is devoid of facts sufficient to prove that Regency was the Cheatles' *alter ego*, alias, stooge, or dummy employed as a device to defraud or wrong Supply. Consequently, if the trial court decided the evidence was sufficient to pierce Regency's corporate veil, the court erred, notwithstanding its probable reliance on a case cited by Supply which we find to be factually inapposite, *National Carloading Corp.* v. *Astro Van Lines, Inc.*, 593 F.2d 559 (4th Cir. 1979) (applying Virginia law, the court apparently pierced the corporate veil and imposed personal liability on sole shareholder of transferor and transferee corporations, on ground that individual effectively had converted sole corporate asset for his personal use by encumbering asset with lien, with specific intent to defraud corporate creditors).

The third issue deals with the matter of actual fraud. In its bill of complaint, the plaintiff labelled the pertinent count as one in "Fraud and Deceit." The question becomes, therefore, whether

the trial court erred in holding (if it did, in fact, so hold) that the Cheatles were guilty of fraud and deceit sufficient to support a personal judgment against them, notwithstanding the fact that the evidence was insufficient to warrant piercing the corporate veil.

■ The wrong of fraud and deceit requires an intentional, knowing misrepresentation by the defendant of a material fact upon which the plaintiff has relied to his detriment. *Winn* v. *Aleda Construction Co.*, 227 Va. 304, 308, 315 S.E.2d 193, 195 (1984). Supply has not established the essential elements of that wrong. It merely contends that the Cheatles acted fraudulently in excluding the Supply debt from the liabilities conveyed to Regency. As the Cheatles point out, this argument, at most, amounts to an assertion that a fraudulent conveyance occurred from Management to Regency, which, if proven, could not justify personal liability on the Cheatles.

There was no evidence that the Cheatles, or either of them, knowingly and intentionally misrepresented material facts to Supply or that Supply relied to its detriment on any such representations. Rather, the evidence negates any motive for the Cheatles to defraud. The record shows that the Cheatles did not gain personally by the reorganization because they were not individually liable to Supply, either on the notes or on the open account. Thus, they received no benefit from the fact that the debt owed to Supply was not included in the liabilities conveyed. We are not persuaded by Supply's contention that the Cheatles received personal benefit from the transfer because the stock of Regency was not encumbered by the liability of Supply. At best, such would be a tenuous, indirect benefit. Also, as the Cheatles point out, the assets conveyed from Supply to Regency were not identified and there is no evidence that the value of those assets exceeded the liabilities transferred. Accordingly, we hold that the trial court erred if it found the Cheatles personally liable on the theory of fraud and deceit.

■ Because none of the three theories advanced by Supply supports a finding against the Cheatles individually, it follows that the trial court erred by awarding compensatory damages against them. Inasmuch as a valid finding of compensatory damages is generally a necessary predicate for an award of punitive damages, it also follows that the award of punitive damages against DeMarr and Cheatle is invalid, even if such damages are properly recoverable in a chancery suit, an issue not addressed by these parties.

For these reasons, the judgment of the trial court in favor of Supply will be reversed and final judgment will be entered here in favor of the Cheatles.

*Reversed and final judgment.*