70 F.3d 111
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
CACI INTERNATIONAL, INCORPORATED; CACI
Incorporated-Federal, Plaintiffs-Appellees,
v.
PENTAGEN TECHNOLOGIES INTERNATIONAL, LTD.; John C. Baird;
Mitchell R. Leiser, Defendants-Appellants,
and
BAIRD TECHNOLOGIES, INCORPORATED, Defendant.
CACI INTERNATIONAL, INCORPORATED; CACI
Incorporated-Federal, Plaintiffs-Appellants,
v.
PENTAGEN TECHNOLOGIES INTERNATIONAL, LTD.; John C. Baird;
Mitchell R. Leiser, Defendants-Appellees,
and
BAIRD TECHNOLOGIES, INCORPORATED, Defendant.
 Nos. 94-2058, 94-2220.
 United States Court of Appeals, Fourth Circuit.
 Nov. 16, 1995.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonie M. Brinkema, District Judge. (CA-93-1631-A)
 ARGUED: Joel Zulman Robinson, JOEL Z. ROBINSON & CO., New York, New York, for Appellants. Joseph William Koegel, Jr., STEPTOE & JOHNSON, Washington, D.C., for Appellees.
 Before WILKINS, LUTTIG, and WILLIAMS, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Appellee, CACI International, Inc. ("CACI"), brought the instant action seeking a declaratory judgment that it did not infringe on appellant Pentagen Technologies International, Ltd.'s ("Pentagen"), copyright and trademark in the MENTIX computer software. CACI also filed a number of pendent state law claims against Pentagen. Pentagen appeals the district court's declaratory judgment in favor of CACI as well as the court's granting of summary judgment in favor of CACI on CACI's state law claim of defamation per se. CACI cross-appeals the judgment in favor of Pentagen on CACI's state law claims of indemnification and tortious interference. We have considered the claims raised by both parties and find them to be without merit. We therefore affirm the judgment of the district court in all respects.
 
 I.
 
 2
 Pentagen, a British corporation with a wholly owned United States subsidiary, Baird Technologies, Inc. ("BTI"), developed MENTIX, the computer software which is at issue in this case. MENTIX is a "computer software CASEtool" which "permit[s] the translation of a computer application language into a form from which it can thereafter be migrated and reconstructed into another computer language." Appellant's Br. at 7. In other words, MENTIX assists in the translation of one computer language into another.
 
 
 3
 In 1989, Robert O'Brien invested in Pentagen, and, as part of the financing of this arrangement, Pentagen issued to O'Brien common stock convertible into secured promissory notes. In the spring of 1990, O'Brien exercised his option and received notes secured by the MENTIX software. At the time that Pentagen issued the secured notes, BTI was attempting to market MENTIX to the Army Material Command ("AMC"), an office within the Department of Defense. Although AMC was impressed with MENTIX and expressed some interest in procuring the software, it had two reservations: that BTI had not previously dealt with the government and that BTI's products would be difficult to procure given the Buy America Act. In order to overcome these two difficulties, BTI sought to enter a teaming agreement with CACI under which CACI, an American company with experience in dealing with the government, would market MENTIX to AMC. During the negotiations between BTI and CACI, BTI assured CACI that it had a Master Licensing Agreement with Pentagen allowing it to license MENTIX.
 
 
 4
 At some point during these negotiations, Pentagen allegedly defaulted on its loan to O'Brien, and O'Brien asserted ownership of MENTIX through his companies Runaway Development Group ("RDG") and Expert Objective Systems Development ("EOSD"). RDG notified CACI that RDG was a successor in interest to Pentagen's MENTIX copyright and provided CACI with a copy of the assignment. On August 15, 1990, CACI signed the Teaming Agreement with BTI, EOSD,[1] and O'Brien. In the agreement, all three parties warranted that they had good title or adequate rights to MENTIX. Later that same day, John Baird, an officer of both Pentagen and BTI, informed CACI that RDG had no title to MENTIX and thus could not provide MENTIX under the Teaming Agreement.
 
 
 5
 Concerned by Baird's claims, CACI asked O'Brien for confirmation of ownership of MENTIX and that O'Brien, BTI and EOSD had adequate rights to MENTIX to provide the software under the Teaming Agreement. After giving CACI the confirmation, O'Brien provided CACI with a copy of MENTIX in September 1990. Pursuant to the Teaming Agreement, CACI immediately made one copy of MENTIX and returned the original. CACI then proceeded to market MENTIX by sending various proposals to and holding meetings with AMC.
 
 
 6
 Unbeknownst to CACI, O'Brien filed suit against Pentagen and BTI in August 1991, alleging securities fraud. In September 1991, Pentagen counterclaimed, asserting that RDG had converted MENTIX because RDG's underlying security interest in MENTIX was void under English law.[2] Following assertion of this counterclaim, Baird again contacted CACI and disputed O'Brien's rights to MENTIX, sending CACI a copy of Pentagen's counterclaim against RDG. Soon after learning of the ongoing litigation and specifically of the counterclaim of conversion, CACI stopped all activity relating to MENTIX and conducted an eight-week review. Upon the conclusion of its review in January 1992, CACI terminated the Teaming Agreement and returned its only copy of MENTIX to O'Brien. CACI was never awarded a government contract by AMC with respect to its efforts to market MENTIX.
 
 
 7
 The following month, the United States Army Information Systems Selection and Acquisition Agency issued a request for proposals for the Army's Sustaining Base Information Services Program ("SBIS"). SBIS was designed "to allow the Army to acquire and implement a government-owned and government-operated open system environment infrastructure, and [to] transition all the active Army Component Sustaining Base Automated Information Systems to this environment by the year 2002." J.A. at 643-44. CACI teamed with IBM as a subcontractor to submit a proposal to the Army. This proposal was accepted in July 1993.
 
 
 8
 That same month, Pentagen filed suit against CACI in the Supreme Court of New York alleging conversion of MENTIX based on CACI's marketing to the AMC. CACI moved to dismiss, and then the action was removed to federal court where the motion to dismiss is currently pending. In December 1993, in the United States District Court for the Southern District of New York, Pentagen filed a second suit against CACI alleging, inter alia, copyright and trademark infringement based on CACI's marketing of MENTIX to AMC, CACI's use of its RENovate methodology,[3] and CACI's development of software for the SBIS contract. CACI filed a motion to dismiss or in the alternative to transfer the action to the Eastern District of Virginia. This motion is still pending. On May 27, 1994, the New York district court stayed both actions pending resolution of the instant case.
 
 
 9
 Believing that the New York district court lacked jurisdiction over it and that the claims would ultimately be litigated in the Eastern District of Virginia, CACI filed the instant declaratory judgment action regarding copyright and trademark infringement. The district court disposed of most of the issues on summary judgment, granting CACI's motion for summary judgment on the copyright and trademark infringement claims, as well as on CACI's state law claim of defamation per se. The district court granted summary judgment for Pentagen on CACI's claim of indemnification and granted judgment for Pentagen on CACI's claim of tortious interference. This appeal followed.
 
 II.
 
 10
 Pentagen appeals the district court's rejection of its claims that CACI infringed on Pentagen's MENTIX copyright by making a copy of MENTIX in September 1990, by marketing MENTIX to the AMC, and through CACI's work on the SBIS contract. The district court held that the claim regarding the September 1990 copy was barred by the Copyright Act's three-year statute of limitations as Pentagen did not file an infringement suit until December 1993. See 17 U.S.C. Sec. 507(b) ("No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."). The district court rejected Pentagen's creative arguments to avoid the limitations bar because Pentagen failed to register its copyright, a statutory requirement for bringing a copyright infringement suit,[4] until December 7, 1993, over three years after the alleged copying took place. See id. at Sec. 411(a) ("[N]o action for infringement of the copyright in any work shall be instituted until registration of the copyright claim has been made in accordance with this title."). With respect to CACI's marketing of MENTIX to the AMC, the district court explained that marketing without actual distribution of a software package does not constitute copyright infringement. As the district court put it, Pentagen had "overlook[ed] an essential element of an infringement claim: that the work was copied." J.A. at 1555. Finally, with respect to CACI's work on the SBIS contract, the district court held that Pentagen had failed to present evidence of indirect copying. To prove indirect copying, the copyright holder must show that the infringer had access to the copyrighted work and that there is a substantial similarity between the copyrighted work and the allegedly infringing work. See, e.g., Keeler Brass Co. v. Continental Brass Co., 862 F.2d 1063, 1065 (4th Cir.1988). The district court held that CACI did not have access to MENTIX at the time it was working on the SBIS proposal, that Pentagen failed to produce evidence of a substantial similarity between MENTIX and a CACI product being used on the SBIS contract, and that unrebutted evidence reflected that MENTIX (or a derivative thereof) could not perform the work offered by CACI on the SBIS project. Accordingly, the district court granted a declaratory judgment in favor of CACI on the copyright infringement claims.[5]
 
 
 11
 Pentagen also appeals the district court's entry of a declaratory judgment in favor of CACI on Pentagen's allegations of trademark infringement. The district court granted CACI summary judgment because trademark infringement claims have a two-year statute of limitations and all of the alleged infringing activities took place over two years before Pentagen filed suit for trademark infringement. See Unlimited Screw Products, Inc. v. Malm, 781 F.Supp. 1121, 1125 (E.D.Va.1991) (analogizing to Virginia's statute of limitations for fraud in holding that there is a two-year statute of limitations for trademark infringement claims brought under Sec. 43(a) of the Lanham Act).
 
 
 12
 Pentagen next appeals the district court's grant of summary judgment in favor of CACI on CACI's state law claim of defamation per se. As the district court explained, "under Virginia law it is defamation per se to prejudice a person in his trade" by making statements which " 'cast aspersion on its honesty, credit, efficiency or its prestige or standing in its field of business.' " J.A. at 1561 (quoting Swengler v. ITT Corp., 993 F.2d 1063, 1071 (4th Cir.1993) (internal quotation marks omitted)); see also Great Coastal Exp., Inc. v. Ellington, 334 S.E.2d 846, 849 (Va.1985). The district court determined that a series of press releases issued by Pentagen which accused CACI, among other things, of "converting the MENTIX software, committing fraud against the United States, and infringing Pentagen's copyright for MENTIX," were made without "reasonable grounds for the charges" and that Pentagen "negligently failed to ascertain the truth." J.A. at 1726-27. Furthermore, the district court determined that CACI was entitled to recover punitive damages because the statements were made with a " 'reckless disregard for their truth' " given that Pentagen refused CACI's offer to examine documents "which CACI claimed would show that Pentagen's allegations were false" and that the evidence in the record reflects that Pentagen made "public statements with knowledge that they were false." J.A. at 1561, 1728 (quoting Ingles v. Dively, 435 S.E.2d 641, 646 (Va.1993)). The district court awarded CACI $1,000 in nominal damages and, because Pentagen acted with malice, $10,000 in punitive damages.
 
 
 13
 CACI cross-appeals the district court's grant of summary judgment in favor of Pentagen on CACI's claim of breach of contract. CACI sought to enforce an indemnification clause in the Teaming Agreement against Pentagen, who was not a party to the Teaming Agreement, on the theory that BTI is Pentagen's alter ego and should be held responsible for BTI's obligations. Under Virginia law, in order to pierce a corporate veil the plaintiff must show that the corporation is " 'the alter ego, alias, stooge, or dummy of the individuals sought to be [held personally accountable] and that the corporation was a device or sham used to disguise wrongs, obscure fraud, or conceal crime.' " R F & P Corp. v. Little, 440 S.E.2d 908, 913 (Va.1994) (quoting Cheatle v. Rudd's Swimming Pool Supply Co., 360 S.E.2d 828, 831 (Va.1987)). In rejecting the attempt to hold Pentagen liable for BTI's obligations, the district court explained that "the two companies have held themselves out as separate entities, separate records are kept, and the formalities associated with corporate entities are observed." J.A. at 1559.
 
 
 14
 CACI also cross-appeals a judgment in favor of Pentagen on CACI's claim that Pentagen tortiously interfered with CACI's SBIS contract with IBM. To establish a claim for tortious interference under Virginia law a plaintiff must show the following:
 
 
 15
 (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.
 
 
 16
 Duggin v. Adams, 360 S.E.2d 832, 835 (Va.1987) (internal quotation marks omitted). The uncontroverted evidence demonstrates that Pentagen contacted the Army, IBM, and others to alert them to its dispute with CACI over "software technology arguably involved in RENovate," J.A. at 1724, and that soon thereafter, IBM sent a letter to CACI stating that RENovate could not be used for any purpose under the SBIS contract without the express permission of IBM. Initially, the district court held that CACI was entitled to summary judgment on the first three elements of tortious interference because Pentagen, with knowledge of the contract between IBM and CACI, communicated with IBM and others in order to "interfere with CACI's contractual relationship with IBM."[6] J.A. at 1560. The court scheduled a trial to determine the amount of damages, and, after receiving testimony from two witnesses, determined that "there is insufficient evidence of actual damage resulting from [Pentagen's] conduct to sustain the Court's previous decision." J.A. at 1723. The district court thus entered judgment in favor of Pentagen.
 
 
 17
 At the damages hearing, CACI estimated that IBM's prohibition on the use of RENovate would cost CACI $186,375 in lost profits since it had planned to use RENovate to "reengineer" portions of existing software, rather than using the more expensive process of forward engineering.[7] See J.A. at 1723-24. The district court, however, concluded otherwise:
 
 
 18
 The evidence, however, does not support Ferguson's conclusion that CACI has actually been foreclosed from using RENovate. First of all, there is no evidence in the record to establish that the Army was interested in having any reengineering performed under Phase II of the SBIS contract at all, let alone that RENovate would be used. Therefore, CACI's evidence is insufficient to establish the first element of the tort: a contractual relationship or reasonable business expectancy. Moreover, the IBM letter is equivocal. It does not bar the use of RENovate, rather it merely requires that CACI seek and obtain written authorization from IBM before using the methodology. Requiring authorization is not substantive interference with, and deprivation of, what are, at best, speculative contractual expectations.
 
 J.A. at 1725.[8]
 
 19
 In addition to appealing the rulings on the merits, Pentagen takes issue with a number of other rulings made by the district court. First, Pentagen appeals an order imposing discovery sanctions against it for "repeated[ ], continuous[ ], andwilful[ ] violat[ions] [of] the applicable Federal Rules of Civil Procedure, and [for] also disobey[ing] th[e] Court's orders." J.A. at 1460. As a result of Pentagen's failure to produce telephone and corporate records despite an order compelling production, the district court, pursuant to Fed. R. of Civ. P. 37(b), issued an order barring Pentagen from introducing evidence relating to the designated allegations in CACI's amended complaint that the requested records bore on.
 
 
 20
 Second, Pentagen argues that the district court abused its discretion and erred in deciding to entertain the instant declaratory judgment action given the previously-filed New York actions. The district court decided to hear this case because this Circuit has no unyielding "firstto-file" rule,[9] see, e.g., Carbide & Carbon Chem. Corp. v. U.S. Industr. Chem., Inc., 140 F.2d 47, 49 (4th Cir.1944) ("[T]he pendency of a prior suit involving the same issues does not require the dismissal of a suit for declaratory judgment." (citations omitted)), and because of the nexus of the forum to the issues and witnesses, the pendent state-law claims which made this action broader than the New York action, and the fact that while jurisdiction and venue were proper in Virginia, the New York courts had yet to rule on the jurisdictional questions.
 
 
 21
 Finally, Pentagen claims that the district judge abused her discretion in denying Pentagen's motion to recuse herself. Pentagen filed a motion to recuse Judge Brinkema on the grounds that Judge Brinkema's husband works in the Administrative Office of the United States Courts and had, at some earlier time, "authorized" a $25,000 contract to a CACI corporation to procure software having nothing to do with the software and methodologies at issue in this case.[10] Pentagen also argues that recusal was warranted because of Judge Brinkema's husband's general interest in computer software that could convert code between computer languages. Pentagen's claims are frivolous on their face. Mr. Brinkema's authorization, in his capacity as a government official, of a contract to a CACI corporation on matters wholly unrelated to the litigation before Judge Brinkema in no way suggests that Judge Brinkema would be biased in this action. Nor does the fact that Mr. Brinkema authorized a contract with CACI on behalf of the government even remotely give rise to a financial or other interest on the part of the Brinkemas which could be affected, much less "substantially affected," by this proceeding,[11] see 28 U.S.C. Sec. 455(b)(4). There is no reason whatsoever for Judge Brinkema to have recused herself from the case based upon the actions of her husband.[12]
 
 CONCLUSION
 
 22
 We have carefully considered the arguments raised by both parties in their briefs, in their supplemental filings, and at oral argument. The judgment of the district court is affirmed on the reasoning of the district court.
 
 
 23
 AFFIRMED.
 
 
 
 [1]
 RDG licensed EOSD to provide MENTIX for the Teaming Agreement
 
 
 [2]
 Apparently, English law does not permit equity interests to be converted into secured loans. In August 1993, this case settled, and on the counterclaim of conversion RDG and EOSD agreed to confess judgment in favor of Pentagen
 
 
 [3]
 RENovate is a "REengineering methodology that identifies the 'good' parts of an organization's old software and REengineers them to work more efficiently in a new, technical environment." Supplemental J.A. at 8
 
 
 [4]
 The statutory exceptions to this requirement are inapplicable here. See 17 U.S.C. Sec. 411(a)
 
 
 [5]
 Pentagen also challenges an award of attorney's fees and costs to CACI. The district court awarded CACI $172,050 pursuant to 17 U.S.C. Sec. 505, which provides for costs to be awarded to the prevailing party in Copyright Act litigation. The district court explained that CACI was entitled to such an award because of the "protracted history of unnecessary discovery problems" and because "Pentagen asserted legal and factual positions at the time of summary judgment that were not objectively reasonable." J.A. at 1729-30 (citing Rosciszewski v. Arete Assoc., Inc., 1 F.3d 225, 234 (4th Cir.1993) (delineating the standard for the district court to apply in exercising its discretion in awarding fees and costs under Sec. 505)). Pentagen does not challenge the amount of the award, but only the propriety of an award in the first instance
 
 
 [6]
 Because of sanctions imposed for discovery abuses, Pentagen was precluded from submitting evidence on the issue of tortious interference
 
 
 [7]
 CACI's self-supporting assertions to the district court concerning the potential use of RENovate on the SBIS contract directly contradict arguments CACI advanced to support summary judgment in its favor on the copyright issue. In its brief, CACI stated:
 CACI introduced unrebutted evidence that it is not performing, and is not scheduled to perform, any software reengineering or to use its RENovate reengineering methodology on the SBIS Contract. J.A. at 645-46. Since CACI is not using RENovate on the SBIS Contract, it cannot, by definition, be engaged in any infringement.
 Appellee's Br. at 39. CACI also argued that "the undisputed facts show that CACI is not performing reengineering work, and thus not using its RENovate methodology on the SBIS Contract." Id. at 41.
 
 
 [8]
 CACI challenges the district court's action on the grounds that a court cannot sua sponte enter summary judgment without giving the losing party notice. While this claim may have merit, we decline to consider it because the district court's finding that there is "insufficient evidence of actual damage," J.A. at 1723, which was properly before the court, is not clearly erroneous in light of the fact that CACI is not foreclosed from using RENovate on the SBIS contract and that reengineering may not even be needed on the SBIS contract
 
 
 [9]
 Additionally, the Supreme Court in Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 21 (1983), stated that the "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." At the time the district court below rejected Pentagen's motion to dismiss, March 4, 1994, the district court in New York had not yet ruled on the motions to dismiss and/or transfer. On May 27, 1994, the New York district court stayed the actions before it pending resolution of this case
 
 
 [10]
 Despite Pentagen's unsupported allegations to the contrary, counsel for CACI stated at oral argument that the outcome of this case would have no impact on the ability of the courts or the AO to use this unrelated software
 
 
 [11]
 In fact, Pentagen seemed to acknowledge that its argument concerning Mr. Brinkema's financial interest, see 28 U.S.C. Sec. 455(b)(4) & (d)(4), was frivolous. In its mandamus petition, Pentagen noted that it did "not believe that current case law supports this part of [its] theory of recusal." Mandamus Petition at 37
 
 
 [12]
 This court views as reprehensible Pentagen's claims that the district court "adopted a Lord Nelson one-eyed view of the facts," that factual coincidences between Judge Brinkema, her spouse and CACI "have created a 'banana republic' perception of the court," and that there was a "fix" between CACI and Judge Brinkema's husband. Appellant's Br. at 8, 11, 17-18