# CIRCUIT COURT OF FAIRFAX COUNTY

Fidelity National
Title Ins. Co. of N.Y.

v.

Madison Title
and Escrow, Inc.

June 8, 2000

Case No. (Chancery) 141381

BY JUDGE DENNIS J. SMITH

Complainant, Fidelity National Title Insurance Company of New York ("Fidelity") brought this suit against Madison Title and Escrow, Inc., a Maryland Corporation, ("Madison-MD") upon grounds of fraud, conversion, and piercing the corporate veil. This matter then came before the Court on November 16, 1999, upon exceptions filed by both parties to the Commissioner's Report dated July 7, 1999, and which determined that the corporate veil of Madison-MD should not be pierced. After considering the pleadings and oral argument of counsel, the following is a discussion of certain exceptions. It is the Court's ruling, however, that Commissioner Byrd's Report is affirmed in its entirety for the reasons stated therein.

Both parties made numerous exceptions to Commissioner Byrd's Report. Specifically, Complainant took the following exceptions: (1) Commissioner Byrd erred in finding that Madison-MD and Madison-VA were not involved in asset stripping and the commingling of funds; and, (2) Commissioner Byrd erred in holding that statements made by Mr. Thomas were not admissible as agency admissions of the principle. Conversely, the Defendant's exceptions were made as follows: (1) the Court has no jurisdiction over Madison-MD under Virginia's Long Arm Statute; (2) the Commissioner erred in finding that

Madison-MD committed a breach of fiduciary duty; and, (3) the Commissioner erred in finding that conversion was established.

As related through the Commissioner's Report, the facts are as follows. The following four corporate parties play an important role in this case:

(1) Complainant, Fidelity is a national title insurance underwriting company;

(2) Defendant Madison-MD is a Maryland corporation operating as a mortgage loan settlement company. Madison-MD was Fidelity's agent for selling title insurance in Maryland;

(3) Madison-VA was Fidelity's agent for selling title insurance in Virginia. Madison-VA is not a party to this suit, but Fidelity did win a judgment against Madison-VA and four of its corporate principals in this Court in October of 1995;

(4) Fidelity Title Services Corporation (FTSC) was part of a three-party agreement to collect premiums for Fidelity from the two Madisons.

While Madison-VA and Madison-MD are purportedly separate corporate entities, there are striking similarities between the two. Madison-VA was incorporated in Virginia in 1988 and had the following shareholders, officers, and directors:

| | |
|---|---|
| Frank Kroeger — 49% | Frank Kroeger — President/Director |
| Joe Love — 49% | Joe Love — Vice President/Director |
| James Barnes — 02% | James Barnes — Vice President/Director |
| | Rita Love — Vice President |

Madison-MD was incorporated in Maryland in 1992 and had the following shareholders, officers, and directors:

| | |
|---|---|
| Brian O'Reilly — 40% | Brian O'Reilly — President/Secretary/Director |
| Frank Kroeger — 40% | Frank Kroeger — Vice President/Treasurer/Director |
| James Barnes — 20% | James Barnes — Director |

In addition to the common shareholders and officers above, the corporations also used the same accountant, attorney, and bond carrier until March of 1994. The corporations' main clients were Mortgage Capital Investors (MCI), which accounted for more than 90% of the business for each of the two companies.

O'Reilly alone managed Madison-MD until March of 1994 when he surrendered control and his shares of the corporation. Limited testimony was presented as to the day to day running of Madison-MD after O'Reilly's departure, but it was established that soon after O'Reilly's departure, Barnes opened a new escrow account for Madison-MD. On May 23, June 9, and August 4, 1994, checks were written from the Madison-VA escrow account to Madison-MD totaling $131,010.92. No legitimate reasons were ever presented by Madison-MD for these transfers. In addition, fifteen smaller checks were written from Madison-VA to Madison-MD between June 14 and August 21, 1994, totaling $40,528.60. Again, no legitimate reasons were ever given for these transfers. Counsel for the defendant admits these transfers totaling $171,539.52 cannot be explained.

By September 4, 1994, Madison-VA became unable to cover checks written on its escrow account to pay off its lenders pursuant to settlements they had done. Madison-VA ultimately defaulted on four checks totaling $626,239.62, and thus, Fidelity was forced to cover that amount. After these defalcations, Fidelity brought suit in this court against Madison-VA and its principals and employees, Kroeger, Barnes, Love, and Thomas. In October 1995, judgment was rendered in favor of Fidelity against all defendants. In that case, the Court determined the individual employees knew at the time that Madison-VA was conducting the four settlements that there were not sufficient funds to discharge the obligations. In addition, the Court found that the individual defendants had written checks out of the Madison-VA escrow account to pay for personal items, home mortgages, and other improper purposes, thereby causing the escrow account to have insufficient funds.

Having won judgments against Kroeger, Barnes, Love, and Thomas, Fidelity now looks to Madison-MD for collection of the $171,539.52. Commissioner Byrd found there was insufficient evidence to pierce the corporate veil of Madison-MD but that Madison-MD had breached its fiduciary duty to Madison-VA. In making findings of fact and applying the law to the facts, the Commissioner found that Madison-MD was not the alter ego of Madison-VA during either the pre-1994 or post-1994 time periods.

It is a well-settled principal that "a corporation is a legal entity entirely separate and distinct from the shareholders or members who compose it." *Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 212, 360 S.E.2d 828 (1987). As the Commissioner noted, refusing to recognize corporate immunity constitutes an extraordinary exception to be permitted only when it becomes necessary to promote justice. *See id.* Such a decision is largely dependent upon determinations of questions of fact. The Commissioner correctly cited the standard for piercing the corporate veil in Virginia. As

stated in *Perpetual Real Estate v. Michaelson Properties*, 974 F.2d 545 (4th Cir. 1992):

> [t]he plaintiff must first establish that the corporate entity was the alter ego, alias, stooge, or dummy of the individuals sought to be charged personally . . . . that proof that some person may dominate or control the corporation is not enough to pierce the veil . . . . *plaintiff must also establish that the corporation was a device or sham used to disguise wrongs, obscure fraud, or conceal crime.*

974 F.2d at 547-48 (citations omitted and emphasis added).

The commissioner correctly held that the evidence presented did not satisfy this standard. Simple confusion is not enough to pierce the corporate veil, but that the moving party must also show that they were injured by the confusion. *Cf. O'Hazza v. Executive Credit Corp.*, 246 Va. 111, 431 S.E.2d 318 (1993). The Commissioner found that while there may have been some confusion as to the identity of the two corporations, the confusion was not to anyone's detriment. In making this finding, the Commissioner pointed out that Fidelity was not an innocent, gullible member of the public but instead had sophisticated counsel who prepared separate contracts in its dealings with Madison-MD and Madison-VA. Fidelity must be charged with knowledge of the information it put into its own contracts and held in its own files. The Commissioner further found that Fidelity was not injured by the inter-relationship of the two Madison corporations before March of 1994. The record supports the Commissioner's finding.

The Commissioner further found there was no evidence offered on the subject of undercapitalization, nor did the evidence presented establish any wrongdoing or fraud on behalf of the corporations prior to March of 1994. Since no one suffered from any fraud, crime, injustice, or unfair disadvantage in this time period, Fidelity failed to produce the necessary evidence required to pierce the corporate veil for the pre-March 1994 time period.

As to the Post-March 1994 period, the Commissioner opined there was a scarcity of evidence as to the nature of the inter-relationship of the two Madison corporations after O'Reilly's departure. No active employee engaged after April 1994 testified at the hearing and the Fidelity employees who testified had no personal observation of Madison during that time. Neither Kroeger, Barnes, Love, nor Thomas testified at the Commissioner's hearing. Moreover, most of the testimonial evidence was hearsay, and the circumstantial documentary evidence presented by Fidelity is tainted with mishandling. When Fidelity learned checks had bounced from Madison-VA,

Fidelity shut down both Madisons and removed all records from both companies. Testimony at the hearing revealed that Fidelity did not label the boxes to account for which documents came from which Madison Corporation. Thus, the documents could have been inadvertently mixed together.

The mere fact that Madison-MD failed to account for the $171,539.52 cannot be enough to declare Madison-MD the alter ego of Madison-VA. It is argued that Kroeger and Barnes, officers of Madison-MD, acted as agents for Madison-MD, or that Madison-MD should be held liable for their actions under a *respondeat superior* theory; however, Commissioner Byrd determined that there was insufficient evidence to support these theories. In fact, evidence to the contrary established that Kroeger, Barnes, Love, and Thomas acted on their own behalf in looting the funds from Madison-VA, not as agents or employees of Madison-MD. In order for an employer to be liable for the acts of his employee, the employee must be acting within the scope of his employment. The Commissioner relied upon the well-established two part test for *respondeat superior* outlined in *Kensington Assocs. v. West*, 234 Va. 430, 362 S.E.2d 900 (1987):

> An act is within the scope of the employment if (1) it was expressly or impliedly directed by the employer, or is naturally incident to the business, and (2) it was performed, although mistakenly or ill-advisedly, with the intent to further the employer's interest, or from some impulse or emotion that was the natural consequence of an attempt to do the employer's business, and did not arise wholly from some external, independent, and personal motive on the part of the [employee] to do the act upon his own account.

*Id.* at 432. The Commissioner found that Fidelity failed to prove either of the required elements, and this Court agrees.

It is uncontroverted that $171,539.52 was transferred from a Madison-VA escrow to Madison-MD between May 23, 1994, and August 21, 1994. Prior to hearing this matter, the amount in controversy was much higher, but through a careful review of the records, counsel found valid reasons for all but $171,539.52. Madison-MD received these funds; they were escrow funds of Madison-VA, and Madison-MD failed to account for these funds.

The Commissioner found that Madison-MD owed a fiduciary duty to account for these funds under the contract of agency and in accordance with Virginia Code § 38.2-1813(A). While the Commissioner did not elaborate on the agency theory, he did state that under § 38.2-1813 of the Virginia Code an

"agent has a duty to the underwriter to account for premiums and all other funds received in any manner by the agent shall be held in a fiduciary capacity and shall be accounted for by the agent." The Commissioner went on to state that Madison-MD knew, or should have known, that the checks drawn on the Madison-VA escrow account were funds belonging to other people, for that is the very nature of an escrow account. The Commissioner then concluded that no evidence was introduced to show any legitimate use by Madison-MD with the $171,539.52, nor was evidence presented regarding the disposition of these monies. The Commissioner determined judgment should be rendered against Madison-MD. This Court again agrees with the Commissioner.

The Commissioner correctly concluded that conversion was established. The Commissioner stated that no one knows where the escrow funds of Madison-VA went, but it was certain they were not used for their intended purpose. The Commissioner analogized the "tort Madison-MD committed"[1] to embezzlement and noted that intent can be inferred from all the facts and circumstances of the case and that embezzlement[2] only requires that a person wrongfully or fraudulently use, dispose of, conceal, or embezzle the property.

Finally, the Commissioner rightly concluded that Madison-MD was duty bound to protect these funds and to return them to Madison-VA or use them for the discharge of the obligations for which they were originally escrowed. Madison-MD did not fulfill these obligations, and thus they converted the escrow funds of Madison-VA. The Commissioner rightly recommended judgment against Madison-MD in the amount of $171,539.52 on this count.

In conclusion, Commissioner Byrd's Report is affirmed in its entirety for the reasons stated therein and articulated above.

---

[1] See Chiang v. Commonwealth, 6 Va. App. 13, 365 S.E.2d 778 (1988).

[2] "The mere failure to return property or account for a trust fund, while evidence of a conversion, does not necessarily constitute embezzlement, but failure to perform an absolute duty to return the property or refusal to account or pay over on demand constitutes embezzlement, or is, at least, evidence from which a fraudulent conversion may be inferred." 29A C.J.S., *Embezzlement*, § 11. "There is no settled mode by which a fraudulent conversion or appropriation must take place, and the means by which it is accomplished are immaterial. It may be effected by any exercise of the right of ownership inconsistent with the owner's rights, and with the nature and purposes of the trust." *Stegall v. Commonwealth*, 208 Va. 719, 160 S.E.2d 566 (1968).