**CIRCUIT COURT OF THE CITY OF NORFOLK**

313 Freemason,
a Condominium Ass'n,
et al.

v.

Freemason Assocs., Inc.,
Conley Hall,
and Thomas Dana

November 22, 2002

Case No. (Law) CL 00-1339

BY JUDGE JOHN C. MORRISON, JR.

This issue comes before the Court on Plaintiff's Motions for Attorney's Fees and Piercing the Corporate Veil. For the reasons stated below, the Court awards $61,213.17 in attorney's fees to Plaintiff 313 Freemason, a Condominium Association ("313 Freemason"). In addition, the Court hereby pierces the corporate veil and holds Defendants Thomas Dana and Conley Hall personally liable for the $37,056.75 jury verdict and the $61,213.17 attorney's fees.

I. *Attorney's Fees*

Section 55-79.53 of the Code of Virginia provides that:

> The declarant, every unit owner, and all those entitled to occupy a unit shall comply with all lawful provisions of this chapter and all provisions of the condominium instruments. Any lack of such compliance shall be grounds for an action or suit to recover sums due. . . . The prevailing party shall be entitled to recover reasonable attorneys' fees and costs expended in the matter.

The person seeking attorney's fees must establish, as an element of his prima facie case, that the fees charged are reasonable. *Seyfarth, Shaw, Fairweather & Geraldson v. Lake Fairfax Seven, Ltd. P'ship*, 253 Va. 93, 96, 480 S.E.2d 471, 473 (1997). "In determining a reasonable fee, the fact finder should consider such circumstances as the time consumed, the effort expended, the nature of the services rendered, and other attending circumstances. . . . Ordinarily, expert testimony will be required to assist the fact finder." *Id.* (quoting *Mullins v. Richlands Nat'l Bank*, 241 Va. 447, 403 S.E.2d 334 (1991)).

This case has followed a long, winding path from the time it was filed until this date. This suit was originally filed on June 14, 2000, by 313 Freemason, Eric and Catherine Steffen, James Klaiber, Richard Sienicki, and Daniel Khoury. The Steffens, Klaiber, Sienicki, and Khoury were the original purchasers of the four units of the condominium. (Mot. for J. ¶¶ 12, 14, 16, 18.) Defendants Freemason Associates, Inc., Thomas Dana, and Conley Hall filed a Motion to Dismiss Improperly Joined Parties on August 11, 2000. The Motion for Judgment was subsequently amended twice. (Am. Mot. for J.; 2d Am. Mot. for J.) On April 18, 2001, the suit was severed into five separate actions. (Order, Apr. 18, 2001.) Plaintiffs each filed separate Motions for Judgment. (3d Am. Mot. for J., Law No. 00-1339; Mot. for J., Law No. 01-1341; Mot. for J., Law No. 01-1342; Mot. for J., Law No. 01-1343; Mot. for J., Law No. 01-1344.) Each Motion for Judgment sought $380,000 in compensatory damages for defects in the roof and the chimneys of the condominium unit and $150,000 in punitive damages. *Id.* The actions remained consolidated for discovery.

On May 3, 2002, Defendants Freemason Associates, Inc., Thomas Dana, and Conley Hall filed a Motion for Summary Judgment. (Mot. for Summ. J.) On August 30, 2002, this Court issued a letter opinion granting partial summary judgment to Defendants.[1] The Court dismissed the claims for damages to the chimneys from the condominium's lawsuit and dismissed the claims for damages to the roof from the lawsuits of the individuals. In addition, the Court dismissed Sienicki and Klaiber's individual lawsuit on the

---

[1] 59 Va. Cir. 407. [Reporter's Note]

ground that they did not have standing to sue for damages to the chimneys because they no longer lived in the units. Finally, the Court dismissed the association's claim for punitive damages because the association failed to plead an independent tort.

The Court held a hearing on November 6, 2002. The Plaintiffs sought $111,456.21 in attorney's fees for the work done by Kaufman & Canoles, P.C., and by Wolcott, Rivers, Wheary, Basnight & Kelly, P.C. ("Wolcott"). Catherine Steffen, one of the unit owners and the President of 313 Freemason, testified that the unit owners agreed at the beginning of the litigation to split the attorney's fees among them. Therefore, all legal services were billed to the condominium association, and the law firms billed the work as if all work was done for one lawsuit.

The Court finds that Plaintiff met its burden in showing that the attorney's fees were reasonable. However, the entire $111,456.21 in attorney's fees was not incurred in 313 Freemason's lawsuit. Kaufman & Canoles charged the association $11,255.58 in attorney's fees and costs. (Hr'g, Nov. 6, 2002,. Pl. Ex. B.) That amount is awarded to 313 Freemason as amounts charged before severance while there was one lawsuit. The Court finds that Wolcott charged $59,184.68 in attorney's fees and costs from the time they began representation, after the case had been severed into five lawsuits, until the Court issued its letter opinion of August 30, 2002. (Hr'g, Nov. 6, 2002, Pl. Ex. A.) One-fifth of that amount, $11,836.94, is awarded to 313 Freemason as it was one of five lawsuits that Wolcott was representing throughout the discovery phase. Finally, the Court finds that Wolcott charged the association $38,120.65 for attorney's fees and costs after the letter opinion was issued through the end of 313 Freemason's trial. (Hr'g, Nov. 6, 2002, Pl. Ex. A.) As these fees were incurred in the preparation and conducting of 313 Freemason's jury trial, the Court awards the entire $38,120.65 to 313 Freemason. Therefore, the Court awards $61,213.17 to 313 Freemason for attorney's fees and costs.

Defendants argued that the attorney's fees were not reasonable because the fees far exceeded the jury verdict of $37,056.75. (Hr'g on Attorney's Fees, Nov. 6, 2002.) However, until August 30, 2002, Plaintiff 313 Freemason was suing for $380,000 in compensatory damages for defects in the roof and the chimneys in addition to the association's claim for $150,000 in punitive damages. (3d Am. Mot. for J.) Given the total claim for $530,000 in damages, the $111,456.21 in attorney's fees is not unreasonable because it exceeds the verdict. The attorney's fees charged were fully supported by time records and by expert testimony regarding the nature of the case and reasonableness of the charges.

Therefore, the Court awards $61,213.17 in attorney's fees and costs to Plaintiff 313 Freemason.

## II. *Piercing the Corporate Veil*

"The independent legal existence of a corporation is a basic component of corporate law and of the economic policy it supports." *O'Hazza v. Executive Credit Corp.*, 246 Va. 111, 115, 431 S.E.2d 318, 320 (1993) (citing *Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 360 S.E.2d 828 (1987)). Piercing the corporate veil to hold individual shareholders liable is "an extraordinary act to be taken 'only when necessary to promote justice'." *Id.* (quoting *Cheatle*, 234 Va. at 212, 360 S.E.2d at 831). There are two prongs to the test for piercing the corporate veil. The plaintiff must first show that the shareholder has "controlled or used the corporation to evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage." *Id.* (citing *Lewis Trucking Corp. v. Commonwealth*, 207 Va. 23, 31, 147 S.E.2d 747, 753 (1966)). In addition, "the unity of interest and ownership [must be] such that the separate personalities of the corporation and the individuals no longer exist and to adhere to that separateness would work an injustice." *Id.*

A decision to pierce the corporate veil should be made reluctantly and cautiously. *In re County Green, L.P.*, 604 F.2d 289, 292 (4th Cir. 1979). The Virginia Supreme Court stated, before its decision in *O'Hazza*, that the determination of whether "a corporation will be regarded as the adjunct, creature, instrumentality, device, stooge, or dummy of another corporation is usually held to be a question of fact in each case . . . and courts will disregard the separate legal identities of the corporation only when one is used to defeat public convenience, justify wrongs, protect fraud or crimes of the other." *Lewis Trucking Corp. v. Commonwealth*, 207 Va. 23, 31 (1966) (quoting *Pepper v. Dixie Splint Coal Co.*, 165 Va. 179 (1935)). The language in *O'Hazza* obviously expands this earlier statement of the requirement for piercing the corporate veil.

Federal courts applying Virginia law have listed several factors to assist in determining when to pierce the corporate veil. The first, and most important, is whether the corporate capitalization is reasonably adequate for the venture. *In re County Green, L.P.*, 438 F. Supp. at 705 (citing *Luckenbach S.S. Co. v. W. R. Grace & Co.*, 267 F. 676, 681 (4th Cir. 1920)). Additional factors include: "failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of

other officers or directors, absence of corporate records, and the fact that the corporation is merely a façade for the operations of the dominate stockholder or stockholders." *Id.* at 705-06.

Both parties agreed to have the Court act as fact finder on the issue of piercing the corporate veil. During the hearing on this issue, the Court made several factual findings that prescribe piercing the corporate veil in this case.

A. *The shareholders controlled or used the corporation to "evade a personal obligation, to perpetrate fraud or a crime, to commit an injustice, or to gain an unfair advantage."*

As explained in Part B below, the Court has found that the sole purpose of the corporation was to hold title of the condominium building and protect the shareholders from liability for what would otherwise have been a personal obligation. Plaintiff has also satisfied the first prong of the test. The Court finds that the shareholders used the corporation to evade a personal obligation and to gain an unfair advantage. On February 4, 1998, Conley Hall wrote a letter to Luke Rigdon, of Rigdon Roofing. (Trial, Pl. Ex. 8.) Hall wrote, in part:

> As you are aware the roof at 313 W. Freemason St. in Norfolk, Va., has leaked from the time it was installed. You have tried to repair it, but as of this writing, it is still leaking. . . . We would like for you to remove and replace all of the roof material even the sheetrock, insulation, and hardwood flooring that has been wet a number of times.

*Id.* On April 26, 2000, Ms. Vonda W. Chappell, an attorney representing Conley Hall and Thomas Dana at the time, wrote a letter to Luke Rigdon. (Trial, Pl. Ex. 13.) The letter stated, in part:

> Our firm has been retained by Freemason Associates, Inc., in connection with the roof which you installed and constructed on [313 Freemason Avenue, Norfolk, Va.].
>
> It appears that the roof has and continues to leak since its installation and, even after you returned to the property to perform repairs back in February 1998, damage has continued to develop internally. Enclosed please find a copy of the estimate for repairs prepared by Baker Roofing for the subject property. It is obvious from this estimate that the roof contains

> major structural defects which have caused extensive damage, both internal and external.

*Id.* Freemason Associates, L.L.C., originally filed the Application for Registration of a Condominium. (Trial, Pl. Ex. 4.) Freemason Associates, Inc., was formed on March 24, 1998, upon the advice of their attorney, Robert Jones, who told Defendants that they would have decreased liability if they formed a corporation. Significantly, although Hall and Dana did many other, similar rehabilitation projects for resale, this is the only project for which Robert Jones ever recommended a corporate form and the only project for which Defendants ever chose to incorporate. In May 1998, Freemason Associates, Inc., filed a revised application, naming itself as declarant of the condominium. The Court concludes that the corporation was formed to evade any personal liability that Dana and Hall would have for the problems with the roof. Defendants knew that the roof was leaking and knew that it needed to be replaced, as evidenced by the letter than Conley Hall wrote to Luke Rigdon. (Trial, Pl. Ex. 8.) The roof was not replaced, however. (Trial, Pl. Ex. 13.) After Defendants realized that there were serious problems with the roof, they incorporated. However, as explained in part B below, Defendants did not run the condominium project through the corporation. Instead, they used the corporation to evade a personal obligation and to gain an unfair advantage.

B. *"The unity of interest and ownership is such that the separate personalities of the corporation and the individuals no longer exist, and to adhere to that separateness would work an injustice."*

Defendants Hall and Dana complied with many of the corporate formalities required of corporations. They filed Articles of Incorporation, drafted by-laws, held shareholder meetings and kept minutes, and filed annual reports. (Hr'g, Def. Ex. A.) However, Defendants conducted what was allegedly the business of the corporation entirely outside of the corporation. The sole asset of the corporation was 313 Freemason. The building was "sold" to the corporation by Thomas Dana in exchange for the corporation's assumption of Dana's personal debt. (Hr'g, Nov. 6, 2002, Testimony of Conley Hall and Thomas Dana.) However, the corporation never assumed the debt and the deed conveying the land to the corporation did not mention the debt the corporation was allegedly assuming. (Hr'g, Nov. 6, 2002, Testimony of Thomas Dana.) Although the corporation did take the property subject to the deed of trust, at no time did Freemason Associates, Inc., become contractually liable for the personal debt of Thomas Dana. *Id.*

Defendant Thomas Dana paid for all project expenses with checks written from his checking account at Wachovia Bank. (Hr'g, Nov. 6, 2002, Testimony of Conley Hall and Thomas Dana.) Conley Hall was not authorized to make payments from that checking account. *Id.* The account was known as the "Rehab" account, and the same account was used to pay the expenses of several projects that Dana and Hall worked on concurrently. (Hr'g, Nov. 6, 2002, Testimony of Thomas Dana.) The corporation did not have its own bank account. *Id.* It was necessary for Thomas Dana to pay all of the expenses related to the condominium from his checking account as the corporation did not have any money to pay its bills itself. *Id.* Dana kept track of the funds in the account by using separate check registers for each project that was expensed through the Wachovia account. *Id.* All of the sales proceeds from the sale of the 313 Freemason condominium units were deposited in Thomas Dana's Wachovia checking account. *Id.* In addition, Freemason Associates, Inc., never filed a single tax return until August 2002. (Hr'g, Nov. 6, 2002, Testimony of Thomas Dana and Pl. Exs. U-X.)

Additionally, upon incorporation, Defendants agreed to a $5,000 Warranty Reserve Fund that would have compensated unit owners for any breaches of warranty that Freemason Associates, Inc., was responsible for paying. (Hr'g, Nov. 6, 2002, Testimony of Thomas Dana.) No money was ever placed in this reserve fund. *Id.*

It is clear in this case that "the unity of interest and ownership is such that the separate personalities of the corporation and the individuals no longer exist, and to adhere to that separateness would work an injustice." Freemason Associates, Inc., was the adjunct, creature, instrumentality, device, stooge, or dummy of Defendants Dana and Hall. Therefore, it is appropriate in this case to pierce the corporate veil and hold Thomas Dana and Conley Hall personally liable for the judgment in this case.

## Conclusion

For the reasons stated above, the Court awards $61,213.17 in attorney's fees to Plaintiff 313 Freemason, a Condominium Association. In addition, the Court hereby pierces the corporate veil and holds Defendants Thomas Dana and Conley Hall personally liable for the $37,056.75 jury verdict and the $61,213.17 attorney's fees.