# HENRIETTA PRICE, ET AL.

## v.

# JOSEPH L. HAWKINS

Record No. 930364

January 7, 1994

Present: All the Justices

*David N. Montague* for appellants.
*David M. Zobel (Huff, Poole & Mahoney*, on brief), for appellee.

JUSTICE COMPTON delivered the opinion of the Court.

In this suit brought under Code § 55-80 to set aside fraudulent conveyances of cash, the only question properly preserved for appellate review is whether the trial court erred by entering *in personam* judgments against transferees who participated in a fraudulent scheme to delay and hinder a creditor by concealing the debtor's assets. As pertinent, § 55-80 provides: "Every gift, conveyance, . . . transfer of, or charge upon, any estate, real or personal, . . . given with intent to delay, hinder or defraud creditors . . . of or from what they are or may be lawfully entitled to shall, as to such creditors, . . . be void."

The present controversy stems from an action at law filed in November 1986 in the Circuit Court of the City of Hampton by appellee Joseph L. Hawkins against Floyd M. Gibbs, Sr., for recovery in damages resulting from defamation and other wrongs. In September 1988, a judgment confirming a jury's verdict in the

amount of $200,000 was entered in favor of Hawkins. That judgment became final after unsuccessful appeals by Gibbs.

In November 1990, Hawkins, the creditor, filed the present suit naming Gibbs, the debtor, as a defendant along with the debtor's two sons, David A. Gibbs and appellant Steven A. Gibbs, and the debtor's girlfriend, appellant Henrietta Price. The suit was brought under § 55-80 to set aside transfers of cash in the total amount of $135,500 from the debtor to Price and the sons.

As the result of a February 1992 ore tenus hearing, the chancellor made the following findings. Beginning in February 1988 and ending in May 1988, the debtor made withdrawals totalling $112,800 from his retirement account. Between March and May 1988, the debtor caused to be transferred to the account of David A. Gibbs the sum of $90,500. In December 1988, the debtor liquidated corporate stock, receiving the sum of approximately $60,220. The debtor transferred additional amounts to David A. Gibbs so that he received a total of $115,500. The debtor then transferred the amount of $10,000 each to Steven A. Gibbs and to Price.

At trial, David A. Gibbs admitted he knew of the original suit and the judgment, but said he accepted the funds from his father as a gift and had no intent to participate in a fraudulent scheme. Steven A. Gibbs said he learned of the original action only after it was concluded. He stated he spent some of the $10,000 for his own purposes, paid some of his father's bills, and returned the remainder to his father. Price testified that she knew of the original action, that she was aware some of the debtor's bank accounts had been attached, and that she accepted the $10,000 in order to place the funds in an account in her own name for the sole purpose of writing checks to pay the debtor's bills. The evidence was uncontradicted that she did not use any of the funds for her own purposes.

After stating at the conclusion of the hearing, "If there was ever a scheme to defraud a creditor, this is it," the chancellor set aside the conveyances as void and entered *in personam* judgments against David A. Gibbs for $115,500, against Steven A. Gibbs for $10,000, and against Price for $10,000. We awarded Price and Steven A. Gibbs this appeal from the December 1992 final decree. David A. Gibbs did not file a petition for appeal.

On appeal, Price and Gibbs contend that the trial court erred in awarding personal judgments against them. They rely on *Mills* v. *Miller Harness Co.*, 229 Va. 155, 158, 326 S.E.2d 665, 667 (1985), in which we said that "nothing" in § 55-80 authorizes "a court to award an *in personam* judgment when a fraudulent conveyance is set aside."

In *Mills,* we reversed that part of the final decree granting one creditor an *in personam* judgment against a transferee and remanded the case with direction that the transferee return the funds to court for ratable distribution to all the creditors.

Price and Gibbs argue, in effect, that the creditor under the circumstances of this case has no remedy under § 55-80 against the fraudulent transferees. They contend the personal judgments are invalid and, distinguishing *Mills* on its facts, argue that ratable distribution is improper.

Price argues that the sum "given" to her "was done to utilize her as a bank account after Floyd Gibbs' own had been seized, and Price merely acted as his agent to disburse his funds. This cannot have been fraud because Floyd Gibbs could have made the preferential payments directly himself." In this branch of her argument, Price is drawing on the Virginia rule that at common law and under § 55-80, "an insolvent debtor may generally make a valid transfer of a portion or the whole of his assets to a bona fide creditor on account of an existing indebtedness, if that is the sole purpose of the debtor and the transfer is for full value." *Bank of Commerce* v. *Rosemary and Thyme, Inc.*, 218 Va. 781, 784, 239 S.E.2d 909, 912 (1978).

Gibbs argues that "approximately $5,941.23 was used to pay his own bills. The rest was paid to his father's credit card debt or returned to his father in cash."

Thus, they contend that no "judgment should have been rendered against Price because she was utilized merely as a conduit for Floyd Gibbs' funds to prefer other creditors, which he had a perfect right to do. Price received not one penny of personal benefit." They contend it "was likewise error to enter judgment against" Gibbs, and, because "key elements" of *Mills* are not present, ratable distribution "cannot apply." Gibbs argues that, in any event, he is liable for only the $5,941.23 he used for his own benefit.

We do not agree with either Price or Gibbs. Their argument completely disregards the trial court's explicit finding, not properly challenged on appeal, that the pair participated in a scheme to defraud the creditor.

Professor Glenn, in his treatise on fraudulent conveyances, discusses the accountability of a transferee or grantee for proceeds of property fraudulently conveyed. Relating the situation "to confusion of goods," the doctrine he discusses "governs the case where a debtor's property is indistinguishably mingled with that of a third person." 1 Garrard Glenn, *Fraudulent Conveyances and Preferences* § 239, at 415 (rev. ed. 1940). When the property "cannot be identified

in any form," such as money placed in a transferee's checking account, Glenn states, "The grantee should respond personally for the value of the property which he has put it out of his power to apply properly." *Id.* According to Glenn, the grantee is placed, as the result of the creditor's proceeding attacking the fraudulent conveyance, "in the position of one holding for account of the debtor, because, the creditor having taken action under the statute, the grantee's title is avoided. Not being able to produce the property, he must surrender the substitute to the creditor." *Id.*

■ "The same reasoning makes the grantee personally liable, on his account, for the value of the original property in case he cannot produce it or a substitute. Receiving the property fraudulently, as against a creditor who takes steps, the grantee is liable to the extent of its value." *Id.*

■ Price and Gibbs argue, however, that the foregoing rule has no application here. As an alternative argument, they rely upon the following exception, discussed by Glenn, to the foregoing rule. "The grievance asserted under the theory of fraudulent conveyance is that property has been put beyond the reach of process normally available to creditors; hence all persons involved in the wrongdoing are responsible for the property, and its proceeds or value. It follows, then, that if a transferee should surrender the property to the debtor, together with its interim earnings, prior to institution of an attack by creditors, he will be relieved of all liability. Such, indeed, is the rule; the transferee being treated as having done nothing but serve as custodian for the debtor, without detriment to the interest of his creditors." 1 *id.* § 57, at 77-78. Price and Gibbs argue that, because funds they received were used for the debtor's obligations or returned to him, they were mere custodians of the $10,000 and the remaining $4,058.77, respectively, and should be relieved of liability in those amounts.

The facts of this case make the exception inapposite. Here, transferees Price and Gibbs did not surrender the cash to the debtor prior to the institution of the creditor's efforts to collect on the judgment. The record shows that the judgment confirming the verdict was entered in September 1988. The creditor's efforts to collect on the judgment began prior to the time when the $10,000 transfers to Price and Gibbs were made on December 23, 1988. Indeed, counsel for Price stated during the trial: "The garnishment and tying up of all Mr. Gibbs' bank accounts started in December of '88 after judgment in September." The transferees embarked on their scheme, detrimental to the creditor's interest, after the creditor's collection efforts began and thus they did not surrender the funds prior to those efforts.

■ Finally, our statement in *Mills* that we "find nothing in the statute authorizing a court to award an *in personam* judgment when a fraudulent conveyance is set aside," should be read in the context of that case and should not be interpreted so broadly as to preclude personal judgments under all circumstances in every case when a fraudulent conveyance is declared void. *Mills,* cited with approval in *Cheatle* v. *Rudd's Swimming Pool Supply Co.,* 234 Va. 207, 212, 360 S.E.2d 828, 830 (1987), applied a remedy fashioned in *Darden* v. *George G. Lee Co.,* 204 Va. 108, 113-14, 129 S.E.2d 897, 900-01 (1963). But *Mills* and *Darden* are distinguishable on their facts; in *Cheatle,* the creditor agreed to the applicability of *Mills.*

In *Darden* and *Mills* the respective debtors had improperly preferred legitimate creditors to the detriment of another creditor. In those cases, ratable distribution, likewise a remedy not explicitly authorized by § 55-80, was appropriate under the circumstances.

■ In the present case, neither Price nor Gibbs was a legitimate creditor of Gibbs, Sr. Instead, they joined in assisting him in hiding assets that the creditor otherwise would have reached in his judgment collection efforts. Here, an *in personam* judgment against these transferees in the full amount of the fraudulent conveyances is appropriate under the circumstances.

■ A mere declaration under § 55-80 that the cash transfers are "void" is meaningless in terms of relief to the defrauded creditor in this case. This is not a situation where the property fraudulently conveyed is realty, when a declaration that the conveyance is void allows restoration of title in the name of the grantor to which the lien of the judgment could attach. This is not a situation where the fraudulent grantor conveys personal property that requires title records for proof of ownership, like motor vehicles, and the property is still in existence and can be located for attachment or levy when the fraudulent transfer is declared void. Here, cash money has been transferred and, if merely ordered to return money to court, the transferees may refuse to do so, or claim that the money transferred has been spent and is no longer available. In effect, the defrauded creditor in this case is without any effective remedy under § 55-80 unless personal judgments are entered against the defrauders.

■ We will not presume that the General Assembly intended to provide a § 55-80 cause of action without a remedy. Moreover, equity will not suffer a wrong to be without a remedy. *Drummond* v. *Rowe,* 155 Va. 725, 730-31, 156 S.E. 442, 444 (1931). Indeed, remedies were fashioned under the statute in both *Darden* and *Mills.*

Consequently, we hold that the trial court did not err by entering *in personam* judgments. Thus, the order appealed from will be

*Affirmed.*

JUSTICE WHITING, with whom JUSTICE KEENAN joins, concurring in part and dissenting in part.

In this case, the majority requires the transferees of two fraudulent money transfers to repay an attacking creditor personally. This requirement is imposed even though the transferees had restored the money over 22 months before the suit was filed. I do not believe that Code § 55-80 authorizes the imposition of this penalty.

The evidence indicates that on or about December 23, 1988, Floyd M. Gibbs, Sr. (the debtor), endorsed over two $10,000 checks payable to him, one to Henrietta Price and one to Steven A. Gibbs (Gibbs). Shortly thereafter, Price deposited her check in a newly created bank account, and returned $6,750 of that amount in cash to the debtor, as evidenced by three canceled checks drawn on that account and payable to cash on January 3, 11, and 13, 1989.

Within a month of Price's receipt of the check, at the debtor's request and in payment of his debts, she issued the following checks on that account: $36.95 for health insurance on December 27, 1988; $3,000 for attorney's fees on January 3, 1989; and $17 for cable service on January 10, 1989. Although Price testified that all of the $10,000 was either returned to the debtor or used to pay his debts, she did not show how the balance of $196.05 was expended.

Gibbs deposited the check endorsed to him in a bank account he shared with his wife. Shortly thereafter, Gibbs testified that he returned $1,630 in cash to the debtor, as evidenced by two checks payable to cash dated December 30, 1988, and January 4, 1989. Gibbs also produced a canceled check for $2,428.75 dated January 3, 1989, issued at the debtor's request to pay the debtor's credit card bill. Gibbs admitted that he used the remaining $5,971.25 for his own purpose.

Hawkins filed this suit to set aside both $10,000 transfers on November 30, 1990, over 22 months after the transferees had made the above payments. A suit to set aside a fraudulent conveyance seeks to subject what was formerly the debtor's property to the claims of his creditors. 1 Garrard Glenn, Fraudulent Conveyances and Preferences § 54, at 75-76 (rev. ed. 1940). If the property transferred is no longer

available to be subjected to those claims, the fraudulent grantee may be required to pay its value to the plaintiff. 1 *id.* § 239, at 415.

However, if the transferee restores the property to the debtor prior to the creditor's "attack," the transferee is not liable for having participated in the fraudulent conveyance. 1 *id.* § 57, at 77-78. As Glenn notes in a later section of his treatise, if the transferee "had returned [the property] to the debtor *before the creditor's attack,* that would have been a complete defense, as we have seen." 1 *id.* § 239, at 415 (emphasis added).

The majority holds that the defense is inapplicable here because the transferees returned the property after Hawkins began his "attack." According to the majority, Hawkins's "attack" began when he filed his garnishment proceedings against the debtor's bank accounts, a few weeks before the transfers.

I believe the majority misinterprets the meaning of the creditor's "attack" in this context. In my view, the word "attack" describes the creditor's suit to set aside the transfer and subject the property, or its proceeds, to his judgment. This is quite evidently Glenn's concept of the "attack" as revealed clearly in the section title leading to his explication of the rationale for this defense: "There Must be a Transfer, Which the Creditor Attacks as Such," 1 *id.* § 55, at 76.

Thus, unlike the majority, I conclude that this defense is available to transferees who surrender the property to the debtor at any time before the creditor files suit to set aside the transfer. This conclusion is consistent with Glenn's use of the word "attack" in the context of this defense. It is also consistent with Glenn's observation that a fraudulent conveyance is a voidable, not a void, transaction, and that a creditor "can get the benefit of his right [to attack the conveyance] only by asserting it in the proper manner," 1 *id.* § 111, at 220.

The remaining question is whether Price and Gibbs should be required to pay Hawkins the amounts they paid the debtor's other creditors before this suit was filed. These payments reduced those creditors' claims, thereby increasing Hawkins's potential recovery from the debtor's remaining assets. In my judgment, these payments have an effect on the debtor's estate similar to a return of the property to the debtor; in each instance, the net value of the estate is increased by the restorations of those sums that had been fraudulently transferred from the estate. Thus, I believe that the transferees should not be required to apply their own funds in a second payment of the debtor's debts.

For these reasons, I would reverse that part of the judgment requiring Price and Gibbs to pay Hawkins those sums that they (1)

had returned to the debtor, or (2) used in payment of his other debts before this suit was filed. I would affirm the judgment for those sums that were not shown to have been so applied.