## CIRCUIT COURT OF FAIRFAX COUNTY

Bernstein Brothers Management

v.

June S. Miller et al.

Case Nos. (Chancery) 145554 and (Law) 147581, 158332

By JUDGE M. LANGHORNE KEITH

November 25, 1997

I asked plaintiff to file a post trial brief and then undertook to provide counsel questions that, among other things, I would wish to see addressed at final argument. The following list is not intended to limit the final argument or indicate that I have focused only on these issues. However, after reading the cases cited in Mr. Estabrook's brief, and thinking about the evidence, I would like counsel to deal with these questions in their final argument:

1. What statute of limitations applies to the fraudulent conveyance claims?

2. What statute of limitations applies to the voluntary conveyance claims?

3. What statute of limitations applies to the conversion claims? Five years?

4. Does equitable tolling apply to any of the statutes of limitation?

5. In the fraudulent conveyance claims, what evidence, if any, must be shown that the grantees were aware of June Miller's intent to delay, hinder, or defraud Bernstein Brothers?

(A) If evidence of the grantees' knowledge of the fraudulent intent is required, must such knowledge be shown by clear and convincing evidence or by the preponderance of the evidence?

(B) If evidence of the grantees' knowledge of the fraudulent intent is required, is a "badge of fraud" standing alone enough? If so, what are the badges of fraud for each of the fraudulent conveyance grantees?

6. Does the holding in *Bruce v. Dean*, 149 Va. 39 (1927), resolve the issue of whether Bernstein Brothers was a "creditor" of June S. Miller at the time she transferred funds to the defendants?

7. How much of June S. Miller's money, as opposed to Joseph Miller's money, was deposited in the WGLFCU account? *e.g.*, insurance proceeds payable to her, social security payments, etc.

8. Is count 42 of the Amended Bill of Complaint the same as count 5?

9. Must there be some "corpus" in existence in order to impose a constructive trust?

10. Has the plaintiff established the value of June S. Miller's assets and the extent of her liabilities at the time she made the conveyances attacked as voluntary conveyances? What is the effect of the applicable statute of limitations on this issue?

February 11, 1998

These cases came on for a hearing on July 21, 1997, and were heard for five days after which the Court took the matter under advisement. Mr. Estabrook filed his post-trial brief on August 28, 1997, and the Court wrote counsel a letter dated November 25, 1997, setting forth certain issues to be addressed at final argument. Mr. Estabrook filed a supplemental brief on December 24, 1997, and Mr. Chase filed a brief in response on January 6, 1998. Final argument was heard on January 7, 1998. On January 13, 1998, Mr. Estabrook filed Plaintiff's points and authorities relating to the Court's ruling on the doctrine of equitable estoppel. On January 20, 1998, Mr. Chase filed a response to Plaintiff's points and authorities.

## I. *Findings of Fact*

For many years, Sam and Aaron Bernstein owned various apartment complexes in Arlington, Virginia. Aaron Bernstein is dead, but his family

continues to own these properties with Mr. Sam Bernstein.[1] The Plaintiff, Bernstein Brothers Management, is agent and property manager for the properties. Defendant, June S. Miller, worked at the law firm of Harrison & Hall, who represented the Bernstein brothers for many years. Mr. Sam Bernstein had known June Miller for twenty years before she came to work for Bernstein Brothers Management in 1981. As part of their management function, Bernstein Brothers Management (hereinafter "BBM") collected rents from tenants. A significant amount of the rent collected was paid in cash. The system used to account for rents consisted of an individual rent card for each apartment, a daily cash receipts journal ("Green Sheets"), deposit summaries, which listed daily receipts by building ("White Sheets"), and bank deposit slips.

While others in the BBM office collected rents, June Miller was primarily responsible for rent collection until she retired on May 25, 1995. After her retirement, the rental receipts increased. The increase created suspicion, and BBM called in two auditors whose audit revealed a total of $1,398,124.00 of rent shortages from 1981 to 1995. BBM referred the matter to the Arlington County Police in July of 1995, and in August, June Miller was arrested and charged with twelve counts of embezzling funds from BBM. After a day of trial, on July 11, 1996, June Miller entered an Alford plea of guilty to each of the twelve charges.

She used three different methods to embezzle rent money, "straight steals" (marking a rent card paid but not entering that receipt on the Green Sheet); "substituted steals" (marking the Green Sheet with a cash receipt but substituting a rent check for the cash so that the sheets would balance and she could keep the cash); and "calculation steals" (on busy days, understating totals on the Green Sheets and keeping the difference). At her sentencing, June Miller admitted that her employers had not missed the money for thirteen years. She was sentenced to fifteen years on each charge, suspended, placed on probation for ten years, and ordered to make restitution in the amount of $550,000.00 and $1,200,000.00, the exact amount to be determined by her probation officer. The sentences were ordered to run concurrently.

June Miller was a trusted, well-liked, "first-rate" employee, the only non-family member employed at BBM for much of her tenure. One of the

---

[1] Richard Graubard testified that in the 1980s there were 17 to 18 buildings with some 460 apartment units. In 1989, the Bernstein brothers sold a large portion of their holdings, but the partnership continues to hold six buildings with 190 units.

reasons she was such a successful embezzler was that BBM had an anti-quated accounting system that failed to inform BBM what the anticipated rent should be each month. A former employee of BBM, Richard Grau-bard, testified that he would have discovered the shortages had he been allowed to complete his rent card audit but that Mr. Sam Bernstein directed him to stop the audit as it was Mr. Bernstein's view that it was the dis-bursement side of the business that needed attention, not the receipt side. The evidence showed that a simple spread sheet would have revealed the embezzlement.

June Miller was extremely evasive in her deposition testimony but ad-mitted that she put some of the BBM money in her checking account and used some of it for her regular cash expenditures. While she testified in her deposition that any money given her children came from her husband's account, she told Detective Stevens she paid her bills with the money and gave some of the embezzled funds to her children and grandchildren. She and Mr. Joseph Miller bought their house at Declaration Court in 1978. The mortgage was paid off nine years later.

After reviewing the evidence, I find that June Miller's children and grandchildren received the following sums in the form of gifts:

*Table One*

| | |
|---|---|
| Sandy Embrey (Daughter) | $127,102.00 |
| Dwayne and Jeanette Miller (Grandson and Granddaughter-in-law) | $ 26,750.00 |
| Justine Miller (Granddaughter) | $ 24,800.00 |
| Darlene Blaum (Granddaughter) | $ 200.00 |
| Chris Blaum (Grandson-in-law) | $ 200.00 |
| Darlene and Chris Blaum (jointly) | $ 100.00 |
| Jennifer Hughlett (Granddaughter) | $ 2,500.00 |
| Valerie Miller (Daughter-in-law) | $ 33,600.00 |
| Ed Miller (Son) | $ 24,500.00 |
| Ed and Valerie Miller (jointly) | $ 3,900.00 |
| Joanne Hughlett (Daughter) | $ 600.00 |
| Overton Hughlett (Son-in-law) | $ 200.00 |
| Ronald Miller (Son) | $ 360.00 |

The evidence established that June Miller was insolvent when she made the above gifts. *Hudson v. Hudson*, 249 Va. 335, 340 (1995).

After June Miller was arrested on August 22, 1995, her husband, Jo-seph Miller, was diagnosed with terminal cancer. In November of 1995,

BBM attached 50% of June and Joseph Miller's joint accounts. After the attachment, Joseph Miller withdrew $29,318.99 from Signet Bank and $3,606.45 from Riggs Bank and endorsed these cashier checks, made payable to him, to his son-in-law, Overton Hughlett. Overton Hughlett then opened a joint account with his wife, Joanne Hughlett, and his brother-in-law, Ronald Miller, at Washington Gas Light Federal Credit Union ("WGLFCU"). Subsequently, other funds payable to Joseph Miller were deposited in the WGLFCU account. Joseph Miller died on January 9, 1996. Funds in the total amount of $19,524.00 payable to June Miller were also deposited into the WGLFCU account. Funds from this account were expended on behalf of June Miller.

Through a series of loan transactions and the change of the beneficiary on Joseph Miller's POD account from June Miller to Ronald Miller, some members of the Miller family facilitated the purchase of a mobile home titled in the name of Ronald Miller and Joseph Miller. June Miller now lives in the mobile home, sharing some of the expenses with her son, Ronald, who uses the mobile home on weekends.

## II. *Conclusions of Law*

Plaintiff's chancery action consists of sixty-one counts contained in an Amended Bill of Complaint filed on February 28, 1997. Counts Thirty-Four to Forty-One, Counts Forty-Four to Forty-Six, and Counts Fifty to Fifty-Six were nonsuited at the beginning of trial. Count Three was omitted in the Amended Bill of Complaint. There is a Count Thirty-Two and a Count Thirty-Two(A). The original Bill of Complaint was filed on August 9, 1996.

On January 17, 1997, BBM filed its attachment action on the law side against Sandy Embrey and June Miller, Defendants. After an *ex parte* hearing, Plaintiff's petition was granted, the Defendants' estates were seized, and the Defendants were required to account for their assets to the appointed receiver, Mr. John Karcha. The attachment action is ancillary to the chancery action. Defendants filed a demurrer to the petition. The Honorable Gerald Bruce Lee heard the matter and issued a letter opinion overruling the demurrer dated April 4, 1997. 42 Va. Cir. 114.

### A. *The Conversion Count*

In Count One, BBM seeks to recover from defendant, June Miller, the funds she converted from BBM. After reviewing all the evidence, the Court

concludes that Ms. Miller converted funds belonging to BBM in the total amount of $1,398,124.00. BBM sued for $1,246,064.00. Amended Bill of Complaint, Count One. BBM concedes that if a statute of limitations applies to the conversion count, Virginia's five-year statute of limitations applies. Application of the statute would limit the judgment entered against June Miller to $342,306.42. However, BBM argues that the statute is inapplicable due to the doctrine of equitable tolling. This doctrine is triggered in BBM's view because of June Miller's fraudulent acts which resulted in the conversion of BBM's property. *See, e.g., STB Marketing Corp. v. Zolfaghari*, 240 Va. 140 (1990). The Court rejected this argument in a ruling from the bench on January 7, 1998. The testimony of Mr. Porter was persuasive on this issue. BBM's failure to control or monitor its cash receipts was a primary factor in the failure of BBM to detect June Miller's embezzlement. As Mr. Porter testified that even a simple spreadsheet would have detected June Miller's schemes, it cannot be said that her acts prevented BBM from detecting the shortages. Mrs. Miller's scheme was not so cunning that ordinary diligence would have been unavailing to discover her defalcations.

Defendant Miller argues that the Court should apply the two-year statute of limitations for fraud rather than the five-year statute that the Supreme Court held was applicable in *Bader v. Central Fidelity Bank*, 245 Va. 286 (1993). Defendant Miller misreads *Bader*. The controlling issue in that case was whether conversion was an action involving the Plaintiff's property. The Supreme Court held that it was and the five-year limitation set forth in Va. Code Ann. § 8.01-243(B) applied. Nothing in this case calls for a departure from that holding. Ms. Miller converted BBM's property. The fact that she fraudulently did so does not change the nature of her tort. It would be a bizarre doctrine that would hold if one conceals a conversion, then a two-year statute applies, but in the absence of concealment, the statute is extended to five years. The five-year statute applies, and BBM's judgment must be limited to $342,306.00 on its conversion count against June Miller.

BBM next argues that the proceeds it obtained in Law No. 147581 (the "First Attachment") and in Law No. 158332 (the "Second Attachment") should be applied to that part of its claim barred by the statute of limitations. BBM relies principally on *General Stencils, Inc. v. Chiappa*, 18 N.Y.2d 125, 219 N.E.2d 169 (1966). There the trial court applied $940.00 paid as restitution in a previous criminal adjudication to reduce that portion of a jury verdict not barred by the statute of limitations. The New York Court of Appeals reversed, holding that the $940.00 must be applied "to

moneys stolen prior to the time the statute barred recovery." 219 N.E.2d at 171. It did so because the restitution was part of the criminal case and concerned money, most of which was stolen prior to the bar. "Moreover, in this case the debtor failed to stipulate to what amount the $940.00 should be applied. In such a case, it is the creditor's option to allocate the payment as he sees fit, and if he fails to do so, the courts must equitably determine the proper allocation." *Id.* But *General Stencils, Inc.*, has no bearing on the attachments in this case. Here we are dealing with attachments before judgment pursuant to Va. Code Ann. § 8.01-540. Whatever the petitioners successfully attached was attached prior to judgment and was for the specific purpose of satisfying judgments against the defendants. In *General Stencils, Inc.*, the funds had not been obtained pursuant to attachments but rather as restitution in an earlier criminal case. Here by statute, the subject of the attachment must be "applied in satisfaction of the judgment." Va. Code Ann. § 8.01-570. As the Plaintiff has now recovered a judgment against June Miller in the amount of $342,306.00, any of June Miller's property that Plaintiff has already received pursuant to the First Attachment and the Second Attachment must be credited against this judgment.

## B. *The Fraudulent Conversion Counts*

In Counts Two, Counts Four through Fourteen, and Count Forty-Two, BBM seeks orders compelling various Defendants to transfer the funds they received from June Miller back to BBM, or in the alternative, for judgments[2] in the amount of such funds. Va. Code Ann. § 55-80 (the "Fraudulent Conveyance Statute"). In pertinent part, that statute provides that "Every gift . . . given with intent to delay, hinder, or defraud creditors . . . or other persons of or from what they are or may be lawfully entitled to shall, as to such creditors . . . or other persons . . . be void." There can be no doubt that as a result of Mrs. Miller's acts, BBM was either a creditor of Mrs. Miller or an "other person" protected by the Fraudulent Conveyance Statute. *Bruce v. Dean*, 149 Va. 39, 45-46 (1927). In order to prevail, BBM is required to show that Mrs. Miller's gifts to her children and grandchildren were made with the intent to hinder, delay, or defraud BBM. The requirement of showing actual intent can usually be shown only by circum-

---

[2] Under the circumstances of this case, judgments are an appropriate remedy, *compare, Price v. Hawkins*, 247 Va. 32 (1994), *with Mills v. Miller Harness Co.*, 229 Va. 155 (1985).

stantial evidence in the form of certain "badges of fraud" from which the fraudulent intent may be inferred. *Fowlkes v. Tucker*, 164 Va. 507 (1935); *Hutcheson v. Savings Bank of Richmond*, 129 Va. 281 (1921); *Todd v. Sykes*, 97 Va. 143 (1899); *Witz, Biedler & Co. v. Osborn*, 83 Va. 227 (1887); *Hyman v. Porter*, 37 Bankr. 56 (E.D. Va. 1984). As indicated above, Mrs. Miller was insolvent when she made the gifts that are now under attack. This fact, coupled with the fact that all the gifts were made to near relatives are sufficient badges of fraud to allow the Court to conclude that BBM had produced enough evidence to shift the burden of proof to the Defendants to show the *bona fide* nature of the gift transactions on the part of the donor. The Defendants have not met that burden. I hold that June Miller made the gift transactions with the intent to delay, defraud, or hinder BBM. This finding does not end the Court's inquiry. The fraudulent intent of the donees must also be shown by clear and convincing evidence. *Bank of Commerce v. Rosemary & Thyme, Inc.*, 218 Va. 781, 784 (1978); *McClintock v. Royall*, 173 Va. 408, 415 (1939). Again, it is not necessary to show such intent directly for:

> It is sufficient that the grantee had knowledge of the facts and circumstances which would have excited the suspicion of a man of ordinary care and prudence and put him upon inquiry as to the *bona fides* of the transaction, which inquiry would necessarily have led to a discovery of the fraud of his grantor.

*Hyman v. Porter, supra*, at 64.

After reviewing all the evidence, I find that with the exception of the $19,524.00 of June Miller's funds transferred to the WGLFCU account, *Price v. Hawkins*, 247 Va. 32 (1994), the gifts accepted by Sandy Embrey and/or Sandy's Cakes in 1995 and the gifts accepted by the Defendants after June Miller's arrest on August 22, 1995, BBM has failed to carry its burden of showing that the donees should be charged with knowledge of Mrs. Miller's fraudulent intent.[3] The other gifts were in amounts that would not alert the suspicion of the donees. Moreover, none of the Defendants were aware of the gifts the other Defendants were receiving from June Miller.

Unless barred by laches, these findings result in judgments against the Defendants on the fraudulent conveyance counts as follows: Sandy Em-

---

[3] The initial transfers into the WGLFCU account I find were not fraudulent. BBM failed to show that the funds from Signet Bank and Riggs Bank were not Joseph Miller's funds.

brey: $47,247.00; Overton D. Hughlett, Joanne M. Hughlett, and Ronald G. Miller: $19,524.00.

Under Virginia law, a fraudulent conveyance has no specific statute of limitations but is governed by the concept of laches. *Hyman v. Porter, supra* at 66. Laches is defined as the neglect or failure to assert a known right or claim for an unexplained period of time under circumstances prejudicial to the adverse party. *Stewart v. Lady*, 251 Va. 106, 114 (1996). The June Miller transfers to the WGLFCU account took place after her arrest in August of 1995, and the fraudulent transfers to Sandy Embrey likewise took place in calendar year 1995. Under these facts, it cannot be said that BBM slept on its rights or that the Defendants have been prejudiced when BBM's Bill of Complaint was filed on August 9, 1996. Thus, laches does not apply, and the above judgments are not barred.

### C. *The Voluntary Conversion Counts*

In Counts Fifteen through Twenty-Seven, BBM seeks orders compelling various Defendants to transfer the funds they received from June Miller back to BBM, or in the alternative, for judgments in the amount of such funds. Va. Code Ann. § 55-81 (the "Voluntary Conveyance Statute"). That statute declares that "Every gift, conveyance, assignment, transfer . . . which is not upon consideration deemed valuable in law [made] by an insolvent transferor . . . shall be void as to creditors whose debts shall have been contracted at the time it [the gift] was made . . . ." *Id*. BBM has proved by a preponderance of the evidence that June Miller was insolvent when she made the gifts set forth in Table One above, as well as the transfers she made to the WGLFCU account. The only question then is whether the applicable statute of limitations would bar the full recovery of those gifts.

Unlike fraudulent conveyances, voluntary conveyances are governed by a five-year statute of limitations. *Hyman v. Porter, supra*, at 66; Va. Code Ann. § 8.01-253. The applicable statute reads in pertinent part as follows:

No gift . . . shall be avoided . . . unless within five years from its recordation, and if not so recorded, within five years from the time the same was or should have been discovered, suit be brought for that purpose . . . .

*Id*.

BBM argues that it did not discover the gifts until after June Miller was arrested in August of 1995, and therefore, its Bill of Complaint was timely

filed under § 8.01-253. This argument ignores the testimony of the experts. After considering that testimony and especially the credibility of Mr. Porter, I find that BBM should have discovered June Miller's thefts and therefore her gifts well before the five-year period provided for in the statute. Thus any gift made before August 9, 1991, cannot be recovered. The following table sets forth the gifts and transfers that are not barred by Va. Code Ann. § 8.01-253:

### Table Two

| | |
|---|---|
| Sandy Embrey | $83,597.00 |
| Dwayne and Jeanette Miller | $11,700.00 |
| Justine Miller | $11,400.00 |
| Darlene Blaum | $ 200.00 |
| Chris Blaum | $ 200.00 |
| Darlene and Chris Blaum | $ 100.00 |
| Jennifer Hughlett | $ 2,500.00 |
| Valerie Miller | $12,200.00 |
| Ed Miller | $12,800.00 |
| Ed and Valerie Miller | $ 2,300.00 |
| Joanne Hughlett | $ 600.00 |
| Overton Hughlett | $ 200.00 |
| Ronald Miller | $ 360.00 |
| Overton D. Hughlett, Joanne M. Hughlett, and Ronald G. Miller | $19,524.00 |

Judgments against the Defendants and in the amounts listed in Table Two are awarded on the voluntary conversion counts.

## D. *The Constructive Trust Counts*

In Counts Twenty-Eight, Twenty-Nine, Thirty, Thirty-One, Thirty-Two, Thirty-Two(A), and Thirty-Three, BBM asks the Court to impose constructive trusts on "all sums" transferred to the Defendants by June Miller. The evidence in this case, however, failed to demonstrate any corpus upon which a constructive trust could be imposed except for the two house trailers in Delaware.

The house trailer purchased by Ronald Miller in his and his father's name was bought with funds provided by his father or from his estate.

BBM argues that this purchase was made with the intent to hinder, delay, or defraud BBM. Ronald Miller's testimony concerning this issue was believable, and I find that there has been a failure of proof concerning this trailer.

Sandy Embrey purchased her trailer for $28,000.00 on November 1, 1996, after she had been served with process in this action. Ms. Embrey was served on August 28, 1996. To purchase the trailer, she used proceeds from the sale of her house in Manassas. That sale was consummated in October of 1996, again after she had been served with process. Ms. Embrey has been ordered to account for the proceeds from the house sale and did so in a filing filed in Law No. 15883 on July 3, 1997, and the receiver now holds the title to the trailer. The evidence adduced by BBM on this issue was compelling, and the Court imposed a constructive trust on Ms. Embrey's trailer until she has satisfied the judgments imposed on her in this action. *Rash v. Hilb, Rogal & Hamilton Co.*, 251 Va. 281 (1996).

E.  *The Equitable Lien Counts*

In Counts Forty-Three and Forty-Seven to Forty-Nine, BBM seeks the imposition of equitable liens on the estates of the Defendants named in those counts. BBM did not submit briefs on the equitable lien issue either in its trial brief or its post-trial briefs. The issue of equitable liens is probably subsumed in the Court's holdings on the constructive trust issue. *See, e.g., Tiller v. Owen*, 243 Va. 176 (1992). The Court denies the relief requested in the equitable lien counts.

F. *The Restitution Count*

In Count Fifty-Seven, BBM moves for an order of restitution against Defendants Overton D. Hughlett, Joanne M. Hughlett, and Ronald Miller. No brief was submitted on this count, but in general, courts have the power to order the restoration of anything to its rightful owner. 16 M.J., *Restitution*, § 1. As the Court has entered judgments against these Defendants, an order of restitution could be considered duplicative. *See, Valentine Waterways Corp. v. The Tug Choptank*, 260 F. Supp. 210 (E.D. Va. 1966). However, here the Court has held that June Miller fraudulently transferred $19,524.00 to an account after she had been arrested. Thus, it does not seem inappropriate for a court, sitting in equity, to order the subject Defendants to restore that amount of money to BBM, and the Court hereby does so.

## G. *The Conspiracy Counts*

Counts Fifty-Eight and Fifty-Nine allege a common law conspiracy between variously June Miller, the estate of Joseph Miller, Overton D. Hughlett, Joanne M. Hughlett, and Ronald Miller. Counts Sixty and Sixty-One allege a statutory conspiracy between the same Defendants.

A civil conspiracy "is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Hechler Chevrolet v. General Motors Corp.*, 230 Va. 396, 402 (1985). There can be no conspiracy to do an act which the law allows. *Id.* Here, BBM has shown that June Miller transferred $19,524.00 of her own funds into the WGLFCU account. While the Court has held that the initial funding of this account was not fraudulent, the $19,524.00 was fraudulently deposited in the account and then dispersed for the benefit of June Miller in violation of Va. Code Ann. § 55-80 and § 55-81. BBM has shown by a preponderance of the evidence that Defendants June Miller, Overton D. Hughlett, Joanne M. Hughlett, and Ronald Miller did combine to accomplish that goal. Therefore, judgment will be entered in the amount of $19,524.00 against these Defendants on Count Fifty-Eight. The Court has already ruled that the acquisition of Ronald Miller's trailer was not fraudulent, so Count Fifty-Nine must fail.

In order to prevail on the statutory conspiracy counts, BBM must show that the Defendants combined to violate Va. Code Ann. § 18.2-499. Such a combination is made actionable by Va. Code Ann. § 18.2-500. As BBM has failed to show that the Defendant combined to "willfully and maliciously" injure BBM in its trade or business, judgment will be entered for the Defendants on Counts Sixty and Sixty-One.

Mr. Estabrook will kindly prepare a draft of a final decree and order in these matters, send it to Defendants' counsel for their comments and endorsement, and file it with the Clerk of the Court to my attention for entry. The order should include a directive to Mr. Karcha to disburse the funds he is holding pursuant to the attachment orders.